**GIBSON, DUNN & CRUTCHER LLP**
Marshall R. King
200 Park Avenue
New York, NY 10166
Phone: (212) 351-2304
Email: MKing@gibsondunn.com

Brian M. Lutz (*pro hac vice*)
555 Mission Street, Suite 3000
San Francisco, CA 94015
Phone: (415) 393-8379
Email: BLutz@gibsondunn.com

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AHMAD ODEH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>IMMUNOMEDICS, INC., et al.,<br><br><br>Defendants. | Case No. 18-cv-17645-MCA-ESK<br><br>CLASS ACTION |

## DEFENDANTS' ANSWER TO THE CONSOLIDATED COMPLAINT

Defendants Immunomedics, Inc. ("Immunomedics" or the "Company"), Behzad Aghazadeh, Scott Canute, Michael Garone, Peter Barton Hutt, Khalid Islam, Usama Malik, Michael Pehl, and Morris Rosenberg ("Individual Defendants" and, collectively with Immunomedics, "Defendants"), by their undersigned attorneys, hereby answer the Consolidated Class Action Complaint ("Complaint"), dated November 18, 2019. Except as expressly admitted or alleged in this Answer, Defendants deny the allegations in the Complaint under Federal Rule of Civil Procedure 8(b).

For ease of reference, Defendants include in this Answer the text and headings used by Plaintiffs in the Complaint. Defendants' answer to each numbered paragraph is immediately below that paragraph. In responding to the allegations in the Complaint, Defendants (i) incorporate into each response to a specific allegation a denial of all allegations in the Complaint to the extent they assert or suggest that Defendants' statements during the putative class period were materially false or misleading in any respect; and (ii) deny any averments in the cover page, headings, subheadings, footnotes, and exhibits of the Complaint. Defendants further respond to the specific allegations in the Complaint as follows:

## INTRODUCTION AND OVERVIEW

1.     Lead Plaintiffs Construction Industry and Laborers Joint Pension Trust and Boris Saljanin (together, "Plaintiffs") hereby bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of Immunomedics, Inc. ("Immunomedics" or the

"Company") between February 9, 2018 and January 17, 2019, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class, as defined below, are Defendants, present or former executive officers of Immunomedics and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)). Plaintiffs seek to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

Paragraph 1 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 1 of the Complaint, except admit that Plaintiffs purport to describe the nature of their action and the putative class that they purport to represent.

2.    Plaintiffs allege the following based on personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of their counsel, Robbins Geller Rudman & Dowd LLP and Block & Leviton LLP. This investigation included, but was not limited to, a review and analysis of: (i) Immunomedics' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Immunomedics' public conference calls; (iii) Immunomedics' press releases; (iv) independent media reports regarding Immunomedics; (v) economic analyses of Immunomedics' stock price movement and pricing and volume data; (vi) consultation with relevant experts; (vii) relevant regulatory communications, including those between the U.S. Food and Drug Administration ("FDA") and Immunomedics; and (viii) other publicly-available material and data identified herein.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 regarding Plaintiffs' investigation, and on that basis deny those allegations.

3.    Counsel's investigation of the facts underlying this action continues, and counsel further believes that relevant facts are known only by Defendants (and

their agents) or are exclusively within their custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Defendants deny the allegations in Paragraph 3 of Complaint. Defendants further state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 regarding Plaintiffs' investigation, and on that basis deny those allegations.

4. Immunomedics is a clinical-stage biopharmaceutical company that purports to develop monoclonal antibody-based products for the targeted treatment of cancer. Since its formation in 1982, the Company has not obtained FDA approval for any drug that it has developed. Prior to and throughout the Class Period, the Company's primary focus was to commercialize sacituzumab govitecan (referred to herein as "IMMU-132") as a third-line therapy for patients with metastatic triple-negative breast cancer ("mTNBC").

Answering Paragraph 4 of the Complaint, Defendants admit that Immunomedics is a clinical-stage biopharmaceutical company developing monoclonal antibody-based products for the targeted treatment of cancer. Except as expressly admitted, Defendants deny the allegations in Paragraph 4 of the Complaint.

5. In February 2016, the FDA granted IMMU-132 "Breakthrough Therapy Designation" (which provides for expedited FDA review). However, investors started to criticize the Company for failing to aggressively capitalize on this opportunity. For instance, in November 2016, the Company's largest shareholder, venBio Select Advisor LLC ("venBio"), complained in proxy materials that Immunomedics had failed to find a partner to assist the Company in obtaining FDA approval of IMMU-132, had been experiencing ongoing delays in ramping up IMMU-132 manufacturing, and otherwise lacked the world-class manufacturing facilities necessary to drive IMMU-132 to potential FDA approval.

Answering Paragraph 5 of the Complaint, Defendants admit that, in February 2016, sacituzumab govitecan was granted Breakthrough Therapy designation from the FDA for the treatment of patients with metastatic triple negative breast cancer ("mTNBC") who have failed at least two prior therapies for metastatic disease. Defendants further admit that the Breakthrough Therapy designation provides pharmaceutical manufacturers with opportunities for frequent interactions with FDA reviewers during a product's development and the ability for the manufacturer to do a rolling submission of a Biologics License Application ("BLA"). Defendants respectfully refer the Court to the November 2016 proxy materials referenced in Paragraph 5 of the Complaint for the complete and accurate content of those documents. Except as expressly admitted, Defendants deny the allegations in Paragraph 5 of the Complaint.

6.    In response to venBio's and other investors' concerns, in February 2017, Immunomedics announced that it had entered into a $2 billion licensing agreement with Seattle Genetics, Inc. ("Seattle Genetics"). Under the terms of the licensing agreement, Seattle Genetics would be responsible for conducting a Phase 3 clinical trial for IMMU-132 in patients with mTNBC and submitting the biologic license application ("BLA") to the FDA for review. Seattle Genetics would also be solely responsible for manufacturing and commercializing IMMU-132. venBio immediately objected to the licensing agreement, claiming that Immunomedics management was giving away the Company's "crown jewel" and asserting that the licensing transaction was really a sale of Immunomedics to Seattle Genetics on the cheap. After a heated proxy battle – and public lawsuit – venBio representatives succeeded in gaining four seats on the Immunomedics Board of Directors and ousting the Company's top executives, including its Chief Executive Officer ("CEO") and the Company's founder.

Answering Paragraph 6 of the Complaint, Defendants admit that, on February 10, 2017, Immunomedics announced that it had entered into an exclusive global licensing agreement with Seattle Genetics, Inc., in a transaction with potential payments of up to $2 billion, plus double-digit tiered royalties on global net sales. Defendants also admit that venBio commenced derivative litigation on February 13, 2017, alleging that members of the Company's Board breached their fiduciary duties when the Board (i) rescheduled the Company's 2016 Annual Meeting of Stockholders and (ii) agreed to the proposed licensing transaction with Seattle Genetics. Defendants further admit that, in March 2017, shareholders voted to elect four shareholders nominated by venBio. In December 2017, the Company's Board of Directors appointed a new CEO. Except as expressly admitted, Defendants deny the allegations in Paragraph 6 of the Complaint.

7.     By late spring 2017, the newly constituted Board of Directors (which included defendants Dr. Behzad Aghazadeh, Scott Canute, Peter Barton Hutt, and Khalid Islam) informed investors that they – unlike Immunomedics' prior management – possessed the requisite expertise to establish the necessary manufacturing infrastructure for IMMU-132 for the specific purpose of obtaining FDA approval and launching the drug in the United States during 2018.

Answering Paragraph 7 of the Complaint, Defendants admit that Dr. Behzad Aghazadeh, Scott Canute, Peter Barton Hutt, and Khalid Islam were elected to the Board of Directors in March 2017. Except as expressly admitted, Defendants deny the allegations in Paragraph 7 of the Complaint.

6

8.     Between November 2017 and February 2018, Immunomedics announced the hiring of defendants Michael Pehl (as CEO) and Morris Rosenberg (as Chief Technology Officer) to further bolster the perceived expertise of the new management team and assure investors that Immunomedics would remain on track in delivering IMMU-132 to the market by the end of 2018.

Answering Paragraph 8 of the Complaint, Defendants admit that Immunomedics appointed Michael Pehl as its CEO in December 2017, and appointed Morris Rosenberg as its CTO in January 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 8 of the Complaint.

9.     On January 31, 2018, however, Defendants discovered that their Morris Plains, New Jersey manufacturing plant, where IMMU-132 would be commercially manufactured if approved by the FDA, suffered from a serious data integrity breach (hereinafter the "Data Integrity Breach"). The Data Integrity Breach was described by Immunomedics internally as involving Company personnel deliberately manipulating bioburden samples, deliberately misrepresenting test procedures in batch records and intentionally backdating batch records (including the dates of the analytical results). The Data Integrity Breach was a critical risk to FDA approval. If the Company failed to demonstrate to the FDA that it had determined the scope of the Data Integrity Breach and remediated it, the FDA would not approve the BLA.

Answering Paragraph 9 of the Complaint, Defendants admit that, in late-January 2018, issues were identified at the Company's Morris Plains, New Jersey, manufacturing plant in a non-routine situation where company personnel came forward alleging past misconduct by other employees. The issues were first raised on Wednesday, January 31, 2018, and as a result of the Company's robust investigative efforts, the Company notified the FDA by February 5, 2018. After investigating the incident, the Company determined that the employee misconduct

identified did not impact finished product quality or present a health risk to those taking the finished product. The other allegations in Paragraph 9 state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 9 of the Complaint.

10. Public documents (made available after the Class Period) reveal Defendants' admissions that they were "immediately" made aware of the Data Integrity Breach upon its discovery in January 2018, and that due to its severity, it was "immediately" reported to the FDA. While Defendants also acknowledged that they concluded the Data Integrity Breach was of the "utmost concern" to them upon its discovery in January 2018, they still deliberately withheld from the FDA (on the basis of a purported attorney-client privilege) facts underlying the scope of the Data Integrity Breach and whether it was ever remediated.

Defendants deny the allegations in Paragraph 10 of the Complaint. To the extent Plaintiffs purport to describe or quote statements made in Immunomedics's correspondences with the FDA, Defendants deny that such descriptions or quotations fully or accurately reflect the content of those correspondences, and respectfully refer the Court to the correspondences themselves for a complete and accurate description of their content.

11. After assuring investors that Immunomedics' new management team – comprised of each of the Individual Defendants (defined herein) in this case – was capable of establishing and managing a world-class manufacturing capability in support of IMMU-132, Defendants were clearly motivated to mislead investors throughout the Class Period regarding the status of the Morris Plains manufacturing facility and conceal the issues involving the Data Integrity Breach.

Defendants deny the allegations in Paragraph 11 of the Complaint.

12.    On February 8, 2018, for example, defendant Michael Pehl deliberately and falsely "confirm[ed] that all critical work streams, including, for example, the previously discussed manufacturing validation runs, are yielding positive results."

Defendants deny the allegations in Paragraph 12 of the Complaint. To the extent Plaintiffs purport to quote statements made on Immunomedics's February 8, 2018 investor call, Defendants deny that such quotations fully or accurately reflect the content of those statements, and respectfully refer the Court to the recording of that investor call, or the transcript thereof, for a complete and accurate description of the statements made.

13.    On the same day, defendant Morris Rosenberg described the Company's purported communications with the FDA concerning Immunomedics' manufacturing capabilities, saying the FDA "[has] seen our whole manufacturing process," but disclosed nothing about how the manufacturing process suffered from a serious Data Integrity Breach or that the FDA had been immediately notified of the Data Integrity Breach.

Defendants deny the allegations in Paragraph 13 of the Complaint. To the extent Plaintiffs purport to quote statements made on Immunomedics's February 8, 2018 investor call, Defendants deny that such quotations fully or accurately reflect the content of those statements, and respectfully refer the Court to the recording of that investor call, or the transcript thereof, for a complete and accurate description of the statements made.

14.    On February 22, 2018, defendant Michael Pehl spoke with analysts and investors about manufacturing process validation at the Morris Plains facility and Immunomedics' preparation of the facility for the highly anticipated FDA

pre-approval inspection. But, again, Pehl said nothing about the Data Integrity Breach at the Morris Plains facility.

Answering Paragraph 14 of the Complaint, Defendants admit that on February 22, 2018, Mr. Pehl spoke with analysts and investors about Immunomedics's preparation of the Company for the FDA pre-approval inspection. Except as expressly admitted, Defendants deny the allegations in Paragraph 14 of the Complaint.

15. In June 2018, while the truth about the Data Integrity Breach was still unknown by the market, Immunomedics sold over 1.7 million shares of stock for net proceeds of $300 million pursuant to a Form S-3ASR and prospectus. Defendants Michael Pehl, Michael Garone, Behzad Aghazadeh, Scott Canute, Peter Barton Hutt and Khalid Islam each signed the S-3ASR. While the SEC filing warned the Company could suffer material adverse effects to its financial condition and results of operations if it suffered a security breach to its information systems, it failed to disclose that Immunomedics already suffered a serious Data Integrity Breach as a result of Immunomedics employees' deliberate and fraudulent conduct. At the time these Pehl, Garone, Aghazadeh, Canute, Hutt and Islam signed the Form S-3ASR and directed the $300 million stock offering, they each had direct knowledge of the circumstances of the Data Integrity Breach.

Answering Paragraph 15 of the Complaint, Defendants admit that, on June 15, 2018, Immunomedics announced the closing of a public offering of 11,500,000 shares of common stock at a price of $24.00 per share. On June 22, 2018, pursuant to the underwriter's full exercise of the over-allotment option, Immunomedics closed the sale of an additional 1,725,000 shares of its common stock. The total net proceeds from this offering, including the exercise of the over-allotment option, was approximately $300 million, after deducting underwriting discounts, commissions,

and other offering expenses. Defendants further admit that Messrs. Pehl, Garone, Aghazadeh, Canute, Hutt, and Islam signed the Form S-3. To the extent Plaintiffs purport to describe statements made in Immunomedics's Form S-3, Defendants deny that such descriptions accurately reflect the content of that Form S-3, and respectfully refer the Court to the Form S-3 itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 15 of the Complaint.

16.    Between August 6 and August 14, 2018, the FDA conducted an inspection of the Morris Plains facility. One key purpose of the inspection was to engage with Immunomedics concerning the status of the Data Integrity Breach. But each time the FDA asked Defendants for written proof regarding the scope of the Data Integrity Breach and whether the Company had resolved it, Defendants refused to provide it to the agency, claiming it was protected by attorney-client privilege.

Answering Paragraph 16 of the Complaint, Defendants admit that the FDA conducted a pre-license inspection at the Company's Morris Plains, New Jersey, antibody manufacturing facility from August 6, 2018 through August 14, 2018. Defendants further admit that the FDA requested privileged documents regarding the Company's investigation into an early 2018 incident at the Morris Plains, New Jersey facility, and the Company objected to the production of those specific documents on privilege grounds. The Company, however, explained the incident in letters to the FDA and in its September 4, 2018 response to the Form 483, and

believed the matter to be resolved. Except as expressly admitted, Defendants deny

the allegations in Paragraph 16 of the Complaint.

17.     On August 14, 2018, during the pre-approval inspection close-out meeting
        with Immunomedics senior executives, the FDA informed the Company that
        without written proof of the Company's verbal assertions concerning the
        scope of the Data Integrity Breach and Immunomedics' purported remediation
        of it, the agency could not make any assessment as to whether the Data
        Integrity Breach had been resolved. On August 14, 2018, moreover, the FDA
        issued a Form 483 to Immunomedics and Michael Pehl – an official report
        issued at the conclusion of an inspection if the investigators identify
        conditions that may constitute violations of relevant statutes – that again
        reiterated that the agency could not assess the Data Integrity Breach due to
        Immunomedics' refusal to provide written proof of resolution. But even in the
        Company's September 4, 2018 final response to the Form 483, Defendants
        again refused to provide the FDA with the required proof.

        Answering Paragraph 17 of the Complaint, Defendants admit the FDA and

other regulatory agencies routinely inspect manufacturing facilities, including in

connection with the review of a BLA, and may issue a notice on Form 483 if it finds

issues with respect to the inspections, to which the facility must adequately respond

in order to avoid escalated regulatory concerns. Defendants further admit that the

FDA issued a Form 483 to Immunomedics on August 14, 2018. Immunomedics

responded to that Form 483 on September 4, 2018. Defendants also admit that the

FDA requested privileged documents regarding the Company's investigation into an

early 2018 incident at the Morris Plains, New Jersey facility, and the Company

objected to the production of those specific documents on privilege grounds. The

Company, however, explained the incident in its September 4, 2018 response to the

Form 483, and believed the matter to be resolved. Except as expressly admitted,

Defendants deny the allegations in Paragraph 17 of the Complaint.

18.  On December 20, 2018, prior to the market open, equity analyst Dr. Elliot
     Favus, M.D. ("Favus") of Favus Institutional Research issued a report (the
     "Favus Report") that broadly disseminated the details of the August 14, 2018
     Form 483 issued to Michael Pehl and Immunomedics. When the market
     opened, the Company's stock price immediately dropped from $17.64 to
     below $13.00 per share, causing investors millions of dollars in damages.

Answering Paragraph 18 of the Complaint, Defendants admit that Favus

Institutional Research LLC issued an analyst report about Immunomedics on

December 20, 2018. To the extent Plaintiffs purport to describe the analyst report,

Defendants deny that such descriptions fully or accurately reflect the content of that

analyst report, and respectfully refer the Court to the report itself for a complete and

accurate description of its content. Except as expressly admitted, Defendants deny

the allegations in Paragraph 18 of the Complaint.

19.  On December 20, 2018, in an effort to obfuscate the news about the Form 483
     and temper the downward stock price pressure, Defendants immediately
     began issuing additional false and misleading statements to investors through
     friendly equity analysts. For instance:

     • At 10:00 a.m. EST, Guggenheim Securities LLC ("Guggenheim")
       analysts stated: "We spoke with management who pointed out to us
       that this Form-483 was already received 4 months ago, this August,
       and the company believes it has addressed [the] manufacturing issues
       cited in the form."

     • At 11:00 a.m. EST, Morgan Stanley analysts stated: "We spoke with
       mgt. . . . [The Company] believes they have communicated with the
       FDA about the issues prior to the 483 and have worked to remediate
       all the key issues. [The Company] further indicated that if these issues,
       including the 483, were material they would have issued a release
       highlighting the issues."

- At 11:30 a.m. EST, Wells Fargo Securities, LLC ("Wells Fargo") analysts stated: "We have spoken with management this morning regarding observations and understand that they occurred as part of a pre-approval inspection in early August . . . and that the observations are 'old news' and a remediation has long been put in place."

- At 1:00 p.m. EST, Piper Jaffray analysts stated: "We spoke with IMMU which emphasized that some observations were flagged and discussed with the FDA well ahead of the inspection and that . . . IMMU feels that it is in a very good place."

- After the markets closed, a Jefferies analyst added: "[T]he company confirmed that it received the inspection reports in August of this year, and feel that it has addressed all of the issues raised during the inspection. While mgmt did not disclose specific content, they were outwardly confident that everything was adequately addressed, and further that they are confident in a positive decision by the FDA on or before the Jan PDUFA date."

Each of these statements, attributed to Immunomedics' management by key sell-side analysts, were materially misleading.[1] Defendants knew, but failed to disclose, that the FDA requested written proof of Data Integrity Breach resolution and Defendants refused to provide that to the agency. Defendants' misstatements succeeded in halting the downward pressure on Immunomedics stock price, which closed down $3.47 per share for the day.

Answering paragraph 19 of the Complaint, Defendants admit that Morgan Stanley, Cowen and Jeffries acted as book-running managers for the Company's June 13, 2018 public offering, and Wells Fargo Securities was the acting lead manager. To the extent Plaintiffs purport to quote various analyst reports, Defendants deny that such quotations fully or accurately reflect the content of those

---

[1] Morgan Stanley, Jefferies and Wells Fargo were underwriters for Immunomedics' June 2018 $300 million common stock offering.

analyst reports, and respectfully refer the Court to the reports themselves for complete and accurate descriptions of their content. Except as expressly admitted, Defendants deny the allegations in Paragraph 19 of the Complaint.

20.　Then, on January 10, 2019, defendant Michael Pehl again deliberately deceived investors when he said the Company "did take care of [the issues listed in the Form 483] very early." One week later, after the close of the market on January 17, 2019, Immunomedics disclosed receipt of a Complete Response Letter ("CRL") notifying the Company that the FDA had rejected approval of IMMU-132 due to unresolved manufacturing violations at the Morris Plains manufacturing facility. As a result, the Company's stock price fell to $13.31 per share, down 26% compared to the prior day's close of $18.09 per share, resulting in a market capitalization loss of approximately $1 billion.

Answering Paragraph 20 of the Complaint, Defendants admit Immunomedics disclosed receipt of a Complete Response Letter ("CRL") on January 17, 2019. To the extent Plaintiffs purport to quote statements made at a J.P. Morgan Healthcare Conference on January 10, 2019, Defendants deny that such quotations fully or accurately reflect the content of those statements, and respectfully refer the Court to the recording of that conference, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 20 of the Complaint.

## JURISDICTION AND VENUE

21.　The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

Answering Paragraph 21 of the Complaint, Defendants admit that Plaintiffs purport to invoke this Court's jurisdiction under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

22.    This Court has jurisdiction over this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

Answering Paragraph 22 of the Complaint, Defendants admit that Plaintiffs purport to invoke this Court's jurisdiction under § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

23.    Venue is properly laid in this District pursuant to 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

Answering Paragraph 23 of the Complaint, Defendants admit that Plaintiffs purport to invoke venue under 28 U.S.C. § 1391(b) and (c). Except as expressly admitted, Defendants deny the allegations in Paragraph 23 of the Complaint.

24.    In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the Nasdaq stock market.

The allegations in Paragraph 24 of the Complaint set forth legal conclusions to which no response from Defendants is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 24 of the Complaint.

# PARTIES

## Plaintiffs

25.   Construction Industry and Laborers Joint Pension Trust ("Pension Trust"), based in Nevada, purchased Immunomedics common stock during the Class Period on the Nasdaq and was damaged thereby. *See* ECF No. 6-2, Ex. B. Pension Trust is a defined-benefit plan that manages approximately $385 million in assets for the benefit of approximately 5,100 participants (including retirees and beneficiaries).

The allegations in Paragraph 25 of the Complaint set forth legal conclusions

to which no response from Defendants is required. To the extent that a response is

required, Defendants lack knowledge or information sufficient to admit or deny the

allegations in Paragraph 25, and on that basis deny those allegations.

26.   Boris Saljanin, a resident of New York, purchased Immunomedics common stock during the Class Period on the Nasdaq and was damaged thereby. *See* ECF No. 11-2, Ex. B.

The allegations in Paragraph 26 of the Complaint set forth legal conclusions

to which no response from Defendants is required. To the extent that a response is

required, Defendants deny the allegations contained in Paragraph 26 of the

Complaint. Defendants further state that they lack knowledge or information

sufficient to admit or deny the allegations concerning Plaintiff's purchase of

Immunomedics common stock in Paragraph 26, and on that additional basis deny

those allegations.

## Defendants

27.   Immunomedics is a Delaware corporation that describes itself as a clinical-stage biopharmaceutical company focusing on the development of antibody-

based products for the treatment of cancer. During all relevant times, the Company stated that its "most advanced product candidate" was IMMU-132. The Company's principal offices are located at 300 The American Road, Morris Plains, NJ 07950. Since the Company was founded in 1982, it has incurred significant operating losses and, over the course of nearly 40 years, has not developed any drug that the FDA approved for marketing and sales in the United States. Immunomedics is a control person of the Individual Defendants within the meaning of §20(a) of the Exchange Act.

Answering Paragraph 27 of the Complaint, Defendants admit that Immunomedics is incorporated in Delaware with its principal executive offices at 300 The American Road, Morris Plains, New Jersey 07950. Defendants also admit that Immunomedics is a clinical-stage biopharmaceutical company developing monoclonal antibody-based products for the targeted treatment of cancer, and that, during 2018 and 2019, sacituzumab govitecan or IMMU-132 was the Company's "most advanced product candidate." Defendants further admit that Immunomedics disclosed to investors that it had "incurred significant operating losses since [its] formation in 1982." 2018 Form 10-K at 18. The remaining allegations in Paragraph 27 of the Complaint state legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the remaining allegations in Paragraph 27 of the Complaint.

28. Defendant Michael Pehl ("Pehl") served as the Company's CEO between December 7, 2017 and February 25, 2019. During that period, Pehl also served as a member of Immunomedics' Board of Directors. The Company's March 2, 2018 Proxy Statement described Pehl as having more than 20 years of experience in hematology and oncology and having launched multiple blockbuster drugs. Prior to being appointed CEO at Immunomedics, Pehl worked in several executive positions at Celgene Corporation ("Celgene").

Pehl was forced to resign from the Company on February 22, 2019, three weeks after the FDA sent a written communication to Immunomedics, which included a copy of the FDA's Establishment Inspection Report concerning, among other things, the Data Integrity Breach at the Morris Plains manufacturing facility.

Answering Paragraph 28 of the Complaint, Defendants admit that Mr. Pehl served as Immunomedics's President and CEO from December 7, 2017 until February 23, 2019. Defendants also admit that, during the course of his employment, Mr. Pehl also served as a member of Immunomedics's Board of Directors. Defendants further admit that Immunomedics's March 2, 2018 Proxy Statement described Mr. Pehl as having "more than 20 years of experience in hematology and oncology" and as having "launched multiple blockbuster drugs in that space including Revlimid, Pomalyst, and Abraxane." Schedule 14A (Mar. 2, 2018 Proxy Statement) at 17. And that prior to joining Immunomedics, "Mr. Pehl spent 11 years at Celgene Corporation, serving as General Manager Germany, Vice President Central Europe, Head of Hematology Europe and subsequently as Head of Global Marketing and finally as President of Hematology & Oncology." *Id.* Mr. Pehl resigned as President, CEO, and member of the Board of Directors effective February 23, 2019. Except as expressly admitted, Defendants deny the allegations in Paragraph 28 of the Complaint.

29.    Prior to and during the Class Period, Pehl was responsible for complying with the Company's Code of Ethics for the CEO and Senior Financial Officers (adopted by Immunomedics Board of Directors in 2003) ("Senior Officer Code of Ethics"). The Senior Officer Code of Ethics required Pehl to

"[c]arefully review a draft of each" "financial press release or other public communications by the Company" and "SEC report and related documents for accuracy and completeness before each such report is filed with the SEC, with particular focus on disclosures issues within his or her area of responsibility." The Senior Officer Code of Ethics warned that any "violation of this Code will subject a Senior Officer to disciplinary action, up to and including a discharge from the Company and, where appropriate, may subject the Senior Officer to civil liability and criminal prosecution." Pehl was also subject to the Company's External Communications Policy ("Communications Policy"). The Communications Policy stated that Pehl, together with the Company's Chief Financial Officer ("CFO") and Head of Investor Relations, were the only persons authorized by Immunomedics to speak on its behalf to the public. The purpose of the Communications Policy was to ensure clear guidelines "for . . . making disclosures of, material information to ensure all required disclosures are made accurately, timely and on a broadly disseminated basis as defined by SEC Regulation Fair Disclosure." The Communications Policy defined "[n]on-public communications with regulators, including the FDA" as a specific example of "[m]aterial [n]on-[p]ublic [i]nformation."

Answering Paragraph 29 of the Complaint, Defendants admit that during the alleged Class Period Mr. Pehl was responsible for complying with Immunomedics's Code of Ethics for CEO and Senior Financial Officials and External Communications Policy. To the extent Plaintiffs purport to quote either the Code of Ethics or the Communications Policy, Defendants deny that such quotations fully or accurately reflect the content of those policies, and respectfully refer the Court to the policies themselves for a complete and accurate description of their content. Except as expressly admitted, Defendants deny the allegations in Paragraph 29 of the Complaint.

30.     Pehl made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶93-103, 106, 108-

20

111, 113-118, and is liable for those false statements and omissions. Pehl is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

Paragraph 30 of the Complaint states legal conclusions to which no response

is required. To the extent that a response is required, Defendants deny the allegations

in Paragraph 30 of the Complaint.

31.    Defendant Usuma Malik ("Malik") served as the acting CFO of the Company during the Class Period. Prior to being appointed acting CFO in August 2018, Malik had served as the Company's Chief Business Officer since August 2017. Malik's appointment as acting CFO followed Michael Garone's August 23, 2018 resignation as CFO. Prior to working for Immunomedics, Malik served in various executive positions at Pfizer Inc., Booz & Co. and KPMG Consulting.

Answering Paragraph 31 of the Complaint, Defendants admit Mr. Malik was

appointed to serve as Immunomedics's Chief Financial Officer on February 23,

2019. Defendants further admit that, prior to such time, Mr. Malik had been serving

as the Company's interim Chief Financial Officer since August 2018, following

Mr. Garone's resignation, and as the Company's Chief Business Officer since

August 2017. Prior to joining the Company, Mr. Malik was the founder and

managing partner of InnoAction Advisory Services, a boutique advisory firm with

clients in the pharmaceutical and medical technologies fields, since January 2013.

Prior to founding InnoAction, Mr. Malik was part of Senior Management at

Bridgewater Associates from December 2011 to December 2012 and served as the

Global Vice President of Strategy and Innovation at Pfizer from November 2007

through November 2011. Previously, Mr. Malik also served in leadership roles at strategy consulting firms including Booz & Co. and KPMG Consulting, advising executive teams and boards on corporate strategy, finance, and business transformation opportunities. Except as expressly admitted, Defendants deny the allegations in Paragraph 31 of the Complaint.

32.     During the Class Period, Malik was responsible for complying with the Company's Senior Officer Code of Ethics. The Senior Officer Code of Ethics required Malik to "[c]arefully review a draft of each" "financial press release or other public communications by the Company" and "SEC report and related documents for accuracy and completeness before each such report is filed with the SEC, with particular focus on disclosures issues within his or her area of responsibility." The Senior Officer Code of Ethics warned that any "violation of this Code will subject a Senior Officer to disciplinary action, up to and including a discharge from the Company and, where appropriate, may subject the Senior Officer to civil liability and criminal prosecution." Malik was also subject to the Communications Policy. The Communications Policy stated that the CEO, Malik and Immunomedics' Head of Investor Relations were the only persons authorized by Immunomedics to speak on its behalf to investors and the public. The purpose of the Communications Policy was to ensure clear guidelines "for . . . making disclosures of, material information to ensure all required disclosures are made accurately, timely and on a broadly disseminated basis as defined by SEC Regulation Fair Disclosure." The Communications Policy defined "[n]on-public communications with regulators, including the FDA" as a specific example of "[m]aterial [n]on-[p]ublic [i]nformation."

Answering Paragraph 32 of the Complaint, Defendants admit that during the alleged Class Period Mr. Malik was responsible for complying with Immunomedics's Code of Ethics for CEO and Senior Financial Officials and External Communications Policy. To the extent Plaintiffs purport to quote either the Code of Ethics or the Communications Policy, Defendants deny that such quotations

22

fully or accurately reflect the content of those policies, and respectfully refer the

Court to the policies themselves for a complete and accurate description of their

content. Except as expressly admitted, Defendants deny the allegations in Paragraph

32 of the Complaint.

33.     Malik made or had authority over the content and dissemination of the false
        and misleading statements and omission set forth herein at ¶¶109-111, 113-
        117, and is liable for those false statements and omissions. Malik is also a
        control person of Immunomedics within the meaning of §20(a) of the
        Exchange Act.

        Paragraph 33 of the Complaint states legal conclusions to which no response

is required. To the extent a response is required, Defendants deny the allegations in

Paragraph 33 of the Complaint.

34.     Defendant Michael Garone ("Garone") served as the Company's CFO from
        the start of the Class Period through his resignation on August 23, 2018, the
        same day he signed the Company's 2018 Form 10-K. Garone continued to
        serve as the Company's Vice President of Finance until he resigned from that
        position as well on December 24, 2018, four days after the publication of the
        Favus Report regarding Immunomedics' Form 483. Prior to working at the
        Company, Garone served in executive financial positions at several
        companies, including Emisphere Technologies, Inc., Australis, Ltd. and
        AT&T, Inc.

        Answering Paragraph 33 of the Complaint, Defendants admit that Mr. Garone

served as the Company's CFO and Vice President of Finance. Defendants also admit

that Mr. Garone resigned as the Company's CFO on August 23, 2018, and resigned

as Vice President of Finance on December 24, 2018. Defendants further admit that,

prior to joining Immunomedics, Mr. Garone served in executive roles at Emisphere

Technologies, Inc., Australis, Ltd., and AT&T Alascom.

35. During the Class Period, Garone was responsible for complying with the Company's Senior Officer Code of Ethics. The Senior Officer Code of Ethics required Garone to "[c]arefully review a draft of each" "financial press release or other public communications by the Company" and "SEC report and related documents for accuracy and completeness before each such report is filed with the SEC, with particular focus on disclosures issues within his or her area of responsibility." The Senior Officer Code of Ethics warned that any "violation of this Code will subject a Senior Officer to disciplinary action, up to and including a discharge from the Company and, where appropriate, may subject the Senior Officer to civil liability and criminal prosecution." Garone was also subject to the Communications Policy. The Communications Policy stated that the CEO, Garone (during the period he was CEO) and Immunomedics' Head of Investor Relations were the only persons authorized by Immunomedics to speak on its behalf to investors and the public. The purpose of the Communications Policy was to ensure clear guidelines "for . . . making disclosures of, material information to ensure all required disclosures are made accurately, timely and on a broadly disseminated basis as defined by SEC Regulation Fair Disclosure." The Communications Policy also defined "[n]on-public communications with regulators, including the FDA" as a specific example of "[m]aterial [n]on-[p]ublic [i]nformation."

Answering Paragraph 35 of the Complaint, Defendants admit that during the

alleged Class Period Mr. Garone was responsible for complying with

Immunomedics's Code of Ethics for CEO and Senior Financial Officials and

External Communications Policy. To the extent Plaintiffs purport to quote either the

Code of Ethics or the Communications Policy, Defendants deny that such quotations

fully or accurately reflect the content of those policies, and respectfully refer the

Court to the policies themselves for a complete and accurate description of their

content. Except as expressly admitted, Defendants deny the allegations in Paragraph

35 of the Complaint.

36.     Garone made or had authority over the content and dissemination of the false
        and misleading statements and omission set forth herein at ¶¶93, 97, 100, 102-
        103, 106, and is liable for those false statements and omissions. Garone is also
        a control person of Immunomedics within the meaning of §20(a) of the
        Exchange Act.

        Paragraph 36 of the Complaint states legal conclusions to which no response

is required. To the extent a response is required, Defendants deny the allegations in

Paragraph 36 of the Complaint.

37.     Defendant Morris Rosenberg ("Rosenberg") served as the Company's Chief
        Technology Officer ("CTO") throughout the Class Period. According to the
        Company's February 28, 2018 press release announcing Rosenberg's January
        2018 hiring, Rosenberg had "been a key consultant to Immunomedics for the
        past nine months, focusing on building an outstanding team and preparing for
        commercial launch [of IMMU-132], including a robust CMC package for
        BLA submission."

        Answering Paragraph 37 of the Complaint, Defendants admit that

Mr. Rosenberg joined Immunomedics as Chief Technology Officer on January 8,

2018. Defendants further admit that Mr. Rosenberg was engaged by the Company

as an independent consultant from May 5, 2017 to January 7, 2018. To the extent

Plaintiffs purport to quote from Immunomedics's February 28, 2018 press release,

Defendants deny that such quotations fully or accurately reflect the content of that

press release, and respectfully refer the Court to the press release itself for a complete

and accurate description of its content. Except as expressly admitted, Defendants

deny the allegations in Paragraph 37 of the Complaint.

38.     Rosenberg was also subject to the Communications Policy. According to the
        Communications Policy, Rosenberg could not speak on behalf of the
        Company "without the prior approval of the Company Spokespersons" (i.e.,
        the current CEO, CFO and Head of Investor Relations, among others). During
        the Class Period, Rosenberg made several public statements on behalf of the
        Company, as alleged at ¶¶95-96, 113-117. In accordance with the
        Communications Policy, defendants Pehl, Garone and Malik had to have
        approved Rosenberg to speak on the Company's behalf regarding, among
        other things, the status of the Morris Plains manufacturing facility during the
        Class Period. The purpose of the Communications Policy was to ensure clear
        guidelines "for . . . making disclosures of, material information to ensure all
        required disclosures are made accurately, timely and on a broadly
        disseminated basis as defined by SEC Regulation Fair Disclosure." The
        Communications Policy defined "[n]on-public communications with
        regulators, including the FDA" as a specific example of "[m]aterial [n]on-
        [p]ublic [i]nformation."

        Answering Paragraph 38 of the Complaint, Defendants admit that

Mr. Rosenberg was responsible for complying with Immunomedics's External

Communications Policy. To the extent Plaintiffs purport to describe or quote the

External Communications Policy, Defendants deny that such descriptions or

quotations fully or accurately reflect the content of that policy, and respectfully refer

the Court to the policy itself for a complete and accurate description of its content.

Except as expressly admitted, Defendants deny the allegations in Paragraph 38 of

the Complaint.

39.     Rosenberg made or had authority over the content and dissemination of the
        false and misleading statements and omission set forth herein at ¶¶95-96, 113-
        117, and is liable for those false statements and omissions. Rosenberg is also

a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

Paragraph 39 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 39 of the Complaint.

40.   Defendant Dr. Behzad Aghazadeh ("Aghazadeh") has been a member of Immunomedics' Board of Directors since March 2017. Throughout the Class Period, Aghazadeh was the Company's Executive Chairman of the Board of Directors. At all relevant times, Aghazadeh served as Managing Partner and Portfolio Manager of venBio. Between 2000 and 2006, Aghazadeh was in the healthcare practice at Booz Allen Hamilton Holding Corporation (now a unit of PricewaterhouseCoopers), and between 2006 and 2011 served as an analyst for Bernstein Value Equities and Sio Capital Management.

Answering Paragraph 40 of the Complaint, Defendants admit that Dr. Aghazadeh has been the Chairman of Immunomedics's Board of Directors since March 2017, and Executive Chairman of Immunomedics since February 2019. Dr. Aghazadeh was also the Managing Partner and Portfolio Manager at venBio, and previously worked for Booz Allen, Sio Capital Management, and Bernstein Value Equities. Except as expressly admitted, Defendants deny the allegations in Paragraph 40 of the Complaint.

41.   Aghazadeh made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶102-103, 106, 113-117, and is liable for those false statements and omissions. Aghazadeh is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

Paragraph 41 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 41 of the Complaint.

42.   Defendant Scott Canute ("Canute") has been a member of Immunomedics' Board of Directors since March 2017. Throughout the Class Period, Canute served on Immunomedics' Executive Committee, Audit Committee, Compensation Committee (Chair), Governance and Nominating Committee and Research & Development Committee. Between 2004 and 2007, Canute served as the President of Global Manufacturing Operations at Eli Lilly and Company and between 2010 and 2011, as President of Global Manufacturing and Corporate Operations at Sanofi Genzyme.

Answering Paragraph 42 of the Complaint, Defendants admit that Mr. Canute has served on the Company's Board of Directors since March 2017, and that he has at various times served on Immunomedics's Executive Committee, Audit Committee, Compensation Committee, Governance and Nominating Committee, and Research and Development Committee. Defendants further admit that, prior to joining Immunomedics, Mr. Canute served as President of Global Manufacturing Operations at Eli Lilly and President of Global Manufacturing and Corporate Operations at Sanofi Genzyme. Except as expressly admitted, Defendants deny the allegations in Paragraph 42 of the Complaint.

43.   Canute made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶102-103, 106, 113-117, and is liable for those false statements and omissions. Canute is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

Paragraph 43 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 43 of the Complaint.

44.    Defendant Peter Barton Hutt ("Hutt") has been a member of Immunomedics' Board of Directors since March 2017. Throughout the Class Period, Hutt served on Immunomedics' Executive Committee, Compensation Committee and Governance and Nominating Committee (Chair). Since 1975, Hutt has served as Senior Counsel of Covington & Burling LLP. Between 1971 and 1975, Hutt served as the FDA's Chief Counsel.

Answering Paragraph 44 of the Complaint, Defendants admit that Mr. Hutt has served on the Company's Board of Directors since March 2017, and that he has served on Immunomedics's Compensation Committee, Governance and Nominating Committee, and Executive Committee. Defendants further admit that Mr. Hutt has served as Senior Counsel at Covington & Burling, LLP since 1975, and that Mr. Hutt was Chief Counsel for the FDA from 1971 to 1975. Except as expressly admitted, Defendants deny the allegations in Paragraph 44 of the Complaint.

45.    Hutt made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶102-103, 106, 113-117, and is liable for those false statements and omissions. Hutt is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

Paragraph 45 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 45 of the Complaint.

46.   Defendant Dr. Khalid Islam ("Islam") has been a member of Immunomedics'
      Board of Directors since March 2017. Throughout the Class Period, Islam
      served on Immunomedics Executive Committee (Chair), Audit Committee
      (Chair), Compensation Committee, Governance and Nominating Committee
      and Research & Development Committee (Chair). Between 2009 and 2014,
      Islam served as the Chairman and CEO of Gentium S.p.A. and since 2014
      served as the Managing Director of Life Sciences Management GmbH.

Answering Paragraph 46 of the Complaint, Defendants admit that Dr. Islam

has served on the Company's Board of Directors since March 2017, and that he has

served on Immunomedics's Executive Committee, Audit Committee, Compensation

Committee, Governance and Nominating Committee, and Research & Development

Committee. Defendants further admit that Dr. Islam has over 30 years of experience

in drug discovery and development of anti-infectives, hematology/oncology, and

CNS in the pharmaceutical and biotechnology industry. Dr. Islam currently serves

as the Managing Director of Life Sciences Management GmbH, a position he has

held since 2014. Previously, Dr. Islam served as Chairman and CEO of Gentium

S.p.A. from 2009 until 2014. Dr. Islam has also served as President and CEO of

Arpida AG and held various positions at Sanofi-Aventis (f/k/a HMR & MMD).

Except as expressly admitted, Defendants deny the allegations in Paragraph 46 of

the Complaint.

47.   Islam made or had authority over the content and dissemination of the false
      and misleading statements and omission set forth herein at ¶¶102-103, 106,
      113-117, and is liable for those false statements and omissions. Islam is also
      a control person of Immunomedics within the meaning of §20(a) of the
      Exchange Act.

Paragraph 47 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 47 of the Complaint.

48.   Defendants Immunomedics, Pehl, Malik, Garone, Rosenberg, Aghazadeh, Canute, Hutt and Islam are collectively referred to herein as "Defendants."

No response is required to Paragraph 48 of the Complaint.

49.   Defendants Pehl, Malik, Garone, Rosenberg, Aghazadeh, Canute, Hutt and Islam are collectively referred to herein as the "Individual Defendants."

No response is required to Paragraph 49 of the Complaint.

## FACTUAL BACKGROUND

### Metastatic Triple-Negative Breast Cancer — "mTNBC"

50.   mTNBC is a serious disease. It includes about 12% of all breast cancer types. mTNBC is more aggressive than other forms of breast cancer. It is more likely to spread to other areas of the body, and there is a higher chance it will come back within the first three years after treatment. It is also more likely to be fatal within the first five years. But once a patient passes those milestones, his or her odds of beating it are about the same as someone with any other type of breast cancer.

Answering Paragraph 50 of the Complaint, Defendants admit that triple-negative breast cancer (TNBC) is an aggressive type of breast cancer, accounting for up to 20 percent of all breast cancers. Defendants further admit that TNBC is more likely to be fatal within the first five years and its prognosis is associated with lower survival rates and more rapid progression than other types of breast cancer. Except as expressly admitted, Defendants deny the allegations in Paragraph 50 of the Complaint.

51.     One of the distinguishing features of mTNBC is that it tests negative for three of the main things – the hormones estrogen and progesterone and a protein called HER2 – that drive other forms of cancer.

Answering Paragraph 51 of the Complaint, Defendants admit that the term TNBC has historically been used to refer to cancers that lack expression of the estrogen receptor (ER), progesterone receptor (PR), and human epidermal growth factor receptor 2 (HER2). Except as expressly admitted, Defendants deny the allegations in Paragraph 51 of the Complaint.

52.     Because mTNBC is different than other forms of cancer in this way, it does not respond to some of the medications that work for these other types of cancer. And patients with mTNBC have a poorer short-term prognosis than other subtypes, in part because of this lack of targeted therapies for this cancer type. See Giampaolo Bianchini, Justin Balko, Ingrid Mayer, Melinda Sanders & Luca Gianni, Triple-negative breast cancer: challenges and opportunities of a heterogeneous disease, 13 Nature Rev. Clinical Oncology, 674-690 (May 17, 2016).

Answering Paragraph 52 of the Complaint, Defendants admit that TNBC cells do not have estrogen or progesterone hormone receptors, or very much of the human epidermal growth factor receptor 2, which means that medicines that target these receptors are not typically effective in TNBC. Defendants further admit that patients with mTNBC have a poorer short-term prognosis than other subtypes, in part because of the lack of targeted therapies for this type of cancer. Except as expressly admitted, Defendants deny the allegations in Paragraph 52 of the Complaint.

53.     Therefore, new targeted treatment therapies are desperately needed to save lives.

Paragraph 53 of the Complaint states a conclusion to which no response is required.

**Sacituzumab Govitecan or IMMU-132**

54. Throughout the Class Period, Immunomedics' primary focus was the commercialization of IMMU-132, which was predominantly intended to be marketed for the treatment of patients with mTNBC who had received at least two prior therapies for metastatic disease. IMMU-132 was also touted as a possible product candidate in the treatment of other solid tumors and cancers.

Answering Paragraph 54 of the Complaint, Defendants admit that IMMU-132 was Immunomedics's "lead product candidate" during the alleged Class Period and that Immunomedics's "corporate strategy" was to "commercialize" IMMU-132 for "the benefit of patients with mTNBC and the creation of value for [its] stockholders." 2018 Form 10-K at 43. Except as expressly admitted, Defendants deny the allegations in Paragraph 54 of the Complaint.

55. IMMU-132 is an antibody-drug conjugate ("ADC"), which means it is made up of an antibody attached to an anticancer drug. IMMU-132 is designed to deliver a specified payload of chemotherapeutics directly to the tumor. The biologic product is believed to work by binding the antibody portion of the drug to the tumor(s), while the anticancer drug portion works to prevent the cancer cells from growing and/or spreading. ADCs have less toxicity than conventional chemotherapy, thereby reducing the total exposure of a patient to the debilitating side effects typically associated with therapeutic agents. This targeted treatment and lower toxic exposure is what makes ADCs unique.

Answering Paragraph 55 of the Complaint, Defendants admit that IMMU-132 is an antibody-drug conjugate ("ADC"), which means it is made up of an antibody attached to an anticancer drug via a chemistry-based linker. Defendants also admit that ADCs are designed to deliver a specific payload of a chemotherapeutic directly

to a tumor while reducing overall toxicities that are usually associated with conventional administration of these chemotherapeutic agents. Defendants further admit that the attachment of effective anti-tumor compounds to antibodies is intended to allow the delivery of these therapeutic agents to tumor sites with better specificity than conventional chemotherapy. This treatment method is designed to optimize the therapeutic window through reducing the systemic exposure of the patient to the therapeutic agents, which ideally minimizes debilitating side effects while maximizing the concentration of the therapeutic agent at the tumor, potentially leading to better efficacy. Except as expressly admitted, Defendants deny the allegations in Paragraph 55 of the Complaint.

56.    As of 2018, if approved by the FDA, IMMU-132 would be the first ADC of its kind approved for use by patients with mTNBC. Given that Immunomedics had failed to obtain FDA approval of any drug candidate in the Company's near 40-year history, market participants were keenly focused on the regulatory pathway of IMMU-132, including the FDA's BLA pre-approval inspection of the Company's Morris Plains manufacturing facility.

Answering Paragraph 56 of the Complaint, Defendants admit that IMMU-132, which received approval from the FDA in April 2020 and is marketed as Trodelvy, is the first ADC approved by the FDA specifically for previously treated mTNBC and is the first FDA-approved anti-Trop-2 ADC. Except as expressly admitted, Defendants deny the allegations in Paragraph 56 of the Complaint.

57.    Because of Immunomedics' history of suffering material operating losses since 1982, the Company had to obtain funding for research and development and operations from the private and public sale of equity and debt securities,

in addition to relatively small amounts of revenue from licensing agreements for other drug compounds. Prior to the Class Period, Immunomedics made a strategic decision to shift from merely developing potential new drug candidates to developing and commercializing therapeutic product candidates. As a result, Immunomedics' spending on research and development increased significantly, costing the Company $53.5 million in 2016, $51.8 million in 2017 and $99.3 million in 2018. This pattern of increased spending was a direct result of the Company's efforts to obtain FDA approval of IMMU-132 and establish a first-class manufacturing facility for the drug.

Answering Paragraph 57 of the Complaint, Defendants admit that Immunomedics has historically invested heavily in its research and development programs, spending $53.5 million in 2016, $51.8 million in 2017, and $99.3 million in 2018. Defendants further admit that the increase in research and development costs for the fiscal year ended June 30, 2018 compared to fiscal 2017 relate in part to preparations for the approval and launch of sacituzumab govitecan in the United States for patients with mTNBC, but also to efforts Defendants were making to upgrade their manufacturing facility from a clinical to a commercial-grade level, and to conduct research of IMMU-132 in other areas of oncology, including bladder cancer and lung cancer. Except as expressly admitted, Defendants deny the allegations in Paragraph 57 of the Complaint.

**Immunemedics' Attempt to License IMMU-132 to Seattle Genetics**

58.   In February 2016, Immunomedics announced that the FDA had granted IMMU-132 Breakthrough Therapy Designation, which serves to speed up the development and FDA review of drugs that could represent an improvement over existing therapies. The FDA's Breakthrough Therapy Designation was a

significant recognition that IMMU-132 had the potential to significantly improve the outcome for patients with mTNBC.

Answering Paragraph 58 of the Complaint, Defendants admit that, on February 5, 2016, Immunomedics announced that IMMU-132 received Breakthrough Therapy Designation from the FDA for the treatment of patients with TNBC who have failed at least two prior therapies for metastatic disease. Defendants further admit that the Breakthrough Therapy Designation was created to expedite the development and review of a drug that is intended to treat a serious or life-threatening disease or condition, and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies.

59. Investors became frustrated with Immunomedics' perceived failure to capitalize on the opportunity presented by the FDA's Breakthrough Therapy Designation. For instance, in 2016, investors believed that Immunomedics' management had failed to maintain sufficient funds to push IMMU-132 through a Phase 3 clinical program, and otherwise failed to find a competent partner to assist in getting IMMU-132 approved by the FDA and in the hands of patients who could benefit from the drug.

Defendants lack information sufficient to admit or deny the allegations in Paragraph 59 of the Complaint, and on that basis deny those allegations.

60. In November 2016, Immunomedics' largest shareholder, venBio, filed materials with the SEC that described a number of Immunomedics' perceived failures with regard to the development and commercialization of IMMU-132. As a result, venBio nominated a majority slate of dissident director candidates and triggered a heated and protracted proxy fight. Among other things, venBio expressed the following concerns:

- In June 2016, the Company announced that it had been ejected from a meeting of the American Society of Clinical Oncology ("ASCO")

because management had failed to adhere to a data embargo policy, meaning that it shared the data on the IMMU-132 clinical trials before the ASCO meeting. As a result, IMMU's share price dropped over 50% after the Company lost the opportunity to further validate IMMU-132 with the medical community and missed out on significant media exposure because of management's missteps.

- The Company's failure to deliver on its promise of signing a partnership or appropriate licensing agreement to move its only viable drug candidate, IMMU-132, through clinical development despite early clinical successes and the rarely-granted Breakthrough Therapy Designation by the FDA.

Answering Paragraph 60 of the Complaint, Defendants admit that on December 6, 2016, venBio Select Advisor LLC, Behzad Aghazadeh, Scott Canute, Peter Barton Hutt, and Khalid Islam filed with the SEC a definitive proxy statement and accompanying proxy card for 2016 Annual Meeting of Stockholders Scheduled for February 16, 2017 to be used in connection with the solicitation of consents from the stockholders of Immunomedics. To the extent that Plaintiffs purport to describe or quote statements made in those SEC filings, Defendants deny that such descriptions or quotations fully or accurately reflect the content of those filings, and respectfully refer the Court to the filings themselves for a complete and accurate description of their content. Except as expressly admitted, Defendants deny the allegations in Paragraph 60 of the Complaint.

61. venBio also asserted that Immunomedics' capability to manufacture IMMU-132 in a commercial setting was a significant concern. According to the venBio, Immunomedics had experienced "[o]ngoing delays" in getting its manufacturing processes ready. venBio expressed that it was "skeptical of IMMU's communicated manufacturing strategy," and stated that "IMMU

cannot manufacture their product without world-class CMC (Chemistry, Manufacturing & Controls) operating flawlessly, which [Immunomedics] likely do[es] not have."

Answering Paragraph 61 of the Complaint, Defendants admit that on December 6, 2016, venBio Select Advisor LLC, Behzad Aghazadeh, Scott Canute, Peter Barton Hutt, and Khalid Islam filed with the SEC a definitive proxy statement and accompanying proxy card for 2016 Annual Meeting of Stockholders Scheduled for February 16, 2017 to be used in connection with the solicitation of consents from the stockholders of Immunomedics. To the extent that Plaintiffs purport to describe or quote statements made in those SEC filings, Defendants deny that such descriptions or quotations fully or accurately reflect the content of those filings, and respectfully refer the Court to the filings themselves for a complete and accurate description of their content. Except as expressly admitted, Defendants deny the allegations in Paragraph 61 of the Complaint.

62. In response to these complaints, on February 10, 2017, the Company announced that it had entered into a $2 billion licensing agreement for IMMU-132 with Seattle Genetics. Under the terms of the licensing agreement, Seattle Genetics would be responsible for conducting a Phase 3 clinical trial for IMMU-132 in patients with mTNBC and submitting the BLA to the FDA for accelerated approval. Seattle Genetics would also be solely responsible for manufacturing and commercializing IMMU-132. In exchange, Seattle Genetics would pay Immunomedics a $250 million up-front payment, with the remaining $1.75 billion being contingent on the drug achieving certain clinical, development, regulatory and sales milestones. Immunomedics would retain the right to co-promote IMMU-132 in the United States by participating in 50% of the sales effort, subject to certain parameters set forth in the agreement.

Answering Paragraph 62 of the Complaint, Defendants admit that, on February 10, 2017, Immunomedics announced that it had entered into an exclusive global licensing agreement with Seattle Genetics, Inc., under which Seattle Genetics would develop, fund, manufacture, and commercialize IMMU-132 in multiple indications. Defendants further admit that the agreement provided for potential payments of approximately $2 billion, plus double-digit tiered royalties on global net sales, and that Immunomedics would retain the right to co-promote in the United States. Defendants respectfully refer the Court to Immunomedics's February 10, 2017 Schedule 14A filing for a complete and accurate description of the licensing agreement, and otherwise deny the remaining allegations contained in Paragraph 62 of the Complaint.

63. While some investors cheered the announcement of the $2 billion licensing deal, which led to an increase in the Company's stock price, venBio immediately and strenuously objected to it. venBio thereafter filed a lawsuit against Immunomedics' former slate of directors, Seattle Genetics and Greenhill & Co., which served as adviser to Immunomedics, and Immunomedics as a nominal defendant. venBio condemned the deal as essentially giving away Immunomedics' "crown jewel" at a price that was well below market. Essentially, venBio claimed the deal was a sale of Immunomedics to Seattle Genetics on the cheap and, at minimum, provided Seattle Genetics the right to acquire a large portion of Immunomedics common stock at a deep discount. venBio also objected to the deal on the basis that Immunomedics' then-Chief Scientific Officer David Goldenberg ("Goldenberg") (Immunomedics' founder), who was married to then-CEO and director Cynthia Sullivan ("Sullivan"), was eligible for various royalties and other payments as a result of the Seattle Genetics transaction, which were not subject to any maximum cap. venBio further alleged that the former directors stood to be awarded lucrative packages on the closing of the deal. Thus, according to venBio, the deal would have enriched Immunomedics

directors and officers at the expense of venBio and other Immunomedics shareholders.

Answering Paragraph 63 of the Complaint, Defendants admit that venBio commenced derivative litigation on February 13, 2017, alleging that members of the Company's Board breached their fiduciary duties when the Board (i) rescheduled the Company's 2016 Annual Meeting of Stockholders and (ii) agreed to the proposed licensing transaction with Seattle Genetics. Defendants respectfully refer the Court to the complaint filed in that derivative lawsuit for a complete and accurate description of the content of that document, and otherwise deny the allegations contained in Paragraph 63 of the Complaint.

64.    At the end of the proxy battle, venBio representatives (and defendants in this case) Aghazadeh, Canute, Hutt, and Islam ultimately gained seats on the Immunomedics Board of Directors. Each of these directors touted their extensive experience in the biotechnology industry and ability to successfully fast-track IMMU-132 to FDA approval and get it to market. For instance, according to venBio:

> Canute's specific expertise in the area of commercial biologics manufacturing (commonly referred to in the industry as Chemistry, Manufacturing, and Controls ("CMC")), as well as his extensive board experience with multiple pharmaceutical companies make him highly qualified to help run Immunomedics's business. In particular, Mr. Canute's experience and expertise in CMC will provide critical assistance to the Company's development of IMMU-132, which cannot be manufactured successfully unless CMC operates flawlessly.

Answering Paragraph 64 of the Complaint, Defendants admit that venBio initiated a proxy battle and received overwhelming support at the 2016 Annual Meeting to assume control and change the mission of the Company. Defendants

further admit that Messrs. Aghazadeh, Canute, Hutt, and Islam were elected to Immunomedics's Board of Directors in March 2017. Except as expressly admitted, Defendants deny the allegations in Paragraph 64 of the Complaint.

65. On May 5, 2017, following venBio's successful campaign to place its people on Immunomedics' Board of Directors, the Company announced that Seattle Genetics had agreed to terminate the licensing agreement and settle the related litigation with venBio. Additionally, the Company announced that Sullivan and Goldenberg were resigning from their positions at Immunomedics. Immunomedics, under the leadership of Aghazadeh, Canute, Hutt, and Islam, announced that the new Board of Directors had conducted a review of the strategy of the Company, including a review of the projected timeline for the BLA submission for IMMU-132. The Company also announced that the planned BLA filing date had slipped to "between late fourth quarter 2017 and first quarter 2018," and was "subject to FDA acceptance of the Company's chemistry, manufacturing and controls filing."

Answering Paragraph 65 of the Complaint, Defendants admit that Immunomedics filed a Form 8-K on May 5, 2017, which announced that (i) the Company and Seattle Genetics entered into an agreement to relinquish their respective rights under the licensing agreement, and (ii) the Company entered into a binding settlement to resolve the derivative litigation discussed above. The Form 8-K also stated:

The recently-seated Immunomedics Board of Directors has conducted a review of the strategy of the Company, including a review of the projected timeline for submission of a Biologics License Applications ("BLA") submission for IMMU-132. These efforts to date have resulted in an updated timeline for the execution of delivering IMMU-132 to market, as well as the assessment of various deal structures and partnerships towards advancing and maximizing the Company's full pipeline for metastatic triple negative breast cancer ("mTNBC") and beyond. The Company is targeting a BLA for IMMU-132 for approval

in mTNBC cancer between late fourth quarter 2017 and first quarter 2018, subject to FDA input on the acceptance of the Company's chemistry, manufacturing and controls filing plan.

Except as expressly admitted, Defendants deny the allegations in Paragraph 65 of

the Complaint.

66.     Around the time of the termination of the Seattle Genetics licensing agreement, Immunomedics hired defendant Rosenberg as an outside consultant to get the Morris Plains manufacturing plant ready for an FDA pre-approval inspection. In November 2017, Immunomedics announced that it hired defendant Pehl due to his "proven ability to successfully navigate the approval and commercialization of ground-breaking drugs in the oncology space – which we are confident IMMU-132 and other products in our pipeline will be." In February 2018, the Company announced that Rosenberg would no longer be just a consultant, but had been hired as Immunomedics' CTO.

Answering Paragraph 66 of the Complaint, Defendants admit that

Immunomedics engaged Mr. Rosenberg as an independent consultant in May 2017,

and hired him as the Company's CTO in January 2018. Defendants further admit

that Immunomedics announced that it had appointed Mr. Pehl as CEO on November

9, 2017. To the extent Plaintiffs purport to describe or quote the November 9, 2017

press release regarding Mr. Pehl's appointment, Defendants deny that those

quotations or descriptions fully or accurately describe the content of that press

release, and respectfully refer the Court to the press release itself for a full and

accurate description of its content. Except as expressly admitted, Defendants deny

the allegations in Paragraph 66 of the Complaint.

67.     The scuttling of the Seattle Genetics deal left Defendants with the need to deliver on their commitment that Immunomedics, alone, could timely file the

IMMU-132 BLA, and get the Morris Plains manufacturing facility ready for a robust FDA pre-approval inspection and commercial production. Indeed, after: (a) nearly 40 years of repeated failures to get a single drug approved by the FDA; (b) Aghazadeh, Canute, Hutt and Islam successfully removed Immunomedics management who were purportedly responsible for those failures; and (c) the repeated assurances to investors that the Company under new management could deliver IMMU-132 to the market, Defendants knew that any failure to do so would be harshly judged by investors and the market.

Defendants deny the allegations in Paragraph 67 of the Complaint.

## FDA Approval Process of Biologics

### Biologics License Application — "BLA"

68.   IMMU-132 is a biological pharmaceutical, or biologic. Biologics differ from conventional drugs in that a biologic is a large, complicated molecule that only comes from living systems or contains organic molecules, whereas non-biologic, small-molecule drugs largely come from chemicals. Often, biologics are injected while drugs are usually swallowed. Biologics are generally so large and complex that their exact structure is unknown. By contrast, conventional drugs have an easily-identifiable chemical structure and can usually be analyzed to determine all their various components.

Answering Paragraph 68 of the Complaint, Defendants admit that IMMU-132

is a biologic pharmaceutical or biologic. Defendants further admit that:

> Most pharmaceuticals or "conventional drugs" consist of pure chemical substances and their structures are known. Most biologics, however, are complex mixtures that are not easily identified or characterized. Biological products differ from conventional drugs in that they tend to be heat-sensitive and susceptible to microbial contamination, thus requiring sterile manufacturing processes.

2019 Form 10-K at 12–13. Except as expressly admitted, Defendants deny the

allegations in Paragraph 68 of the Complaint.

69.   Prior to the marketing and sale of any biologic, the product must go through an extensive FDA approval process. The approval process includes

completion of preclinical laboratory tests and animal studies, performance of clinical trials in humans, submission of a BLA, and FDA review and approval of the application.

Answering Paragraph 69 of the Complaint, Defendants admit that the process required by the FDA before biologic product candidates may be marketed in the United States generally involves the following:

• completion of preclinical laboratory tests and animal studies performed in accordance with the FDA's current Good Laboratory Practices regulations;

• submission to the FDA of an Investigational New Drug Application which must become effective before human clinical trials may begin and must be updated annually;

• approval by an independent Institutional Review Board ethics committee at each clinical site before the trial is initiated;

• performance of adequate and well-controlled clinical trials to establish the safety, purity and potency of the proposed biologic, and its safety and efficacy for each indication;

• preparation of and submission to the FDA of a BLA for a new biologic, after completion of all pivotal clinical trials;

• satisfactory completion of an FDA Advisory Committee review, if applicable;

• a determination by the FDA within 60 days of its receipt of a BLA to file the application for review;

• satisfactory completion of an FDA pre-approval inspection of the manufacturing facilities to assess compliance with current Good Manufacturing Practice ("cGMP") regulations; and

• FDA review and approval of a BLA for a new biologic, prior to any commercial marketing or sale of the product in the United States.

44

2019 Form 10-K at 12. Except as expressly admitted, Defendants deny the

allegations in Paragraph 69 of the Complaint.

70.     While a new drug application ("NDA") is used for drugs, a BLA is required
        for biological products. The process is so similar, in fact, that the FDA Form
        356h is used for both NDA and BLA submissions. Like an NDA submission,
        the BLA submission can be tens of thousands of pages long. The BLA
        similarly includes detailed information on the biologic, including the data and
        results from both the preclinical and clinical testing and trials, as well as
        information concerning the biologic's chemistry, manufacturing, controls and
        proposed labeling. The FDA evaluates the BLA to determine whether the
        biologic is safe and effective for its intended use. Additionally, and
        importantly, the FDA must make a determination that the manufacturing
        process and facilities meet applicable regulations and requirements to ensure
        the continued safety, purity and potency of the product. The regulations
        regarding BLAs for therapeutic biological products include 21 C.F.R. parts
        600, 601, and 610.

        Answering Paragraph 70 of the Complaint, Defendants admit the following:

        The results of the preclinical and clinical testing, along with
        information regarding the manufacturing of the product and proposed
        product labeling, are evaluated and, if determined appropriate,
        submitted to the FDA through a BLA. The application includes all
        relevant data available from pertinent preclinical and clinical trials,
        including negative or ambiguous results as well as positive findings,
        together with detailed information relating to the product's chemistry,
        manufacturing, controls and proposed labeling, among other things.
        Once the BLA submission has been accepted for filing, the FDA's
        standard goal is to review applications within ten months of the filing
        date or, if the application relates to a drug that treats a serious condition
        and would provide a significant improvement in safety or effectiveness
        qualifying for Priority Review, six months from the filing date. The
        review process is often significantly extended by FDA requests for
        additional information or clarification. . . .

        The FDA reviews the BLA to determine, among other things, whether
        the proposed product is safe, pure and potent, which includes
        determining whether it is effective for its intended use, and whether the

product is being manufactured in accordance with cGMP, to assure and preserve the product's identity, strength, quality, potency and purity. The FDA may refer an application to an advisory committee for review, evaluation and recommendation as to whether the application should be approved, and applications for new molecular entities and original BLAs are generally discussed at advisory committee meetings unless the FDA determines that this type of consultation is not needed under the circumstances. The FDA is not bound by the recommendation of an advisory committee, but it typically follows such recommendations.

After the FDA evaluates the BLA and conducts inspections of manufacturing facilities, it may issue an approval letter or a CRL. An approval letter authorizes commercial marketing of the biologic with specific prescribing information for specific indications. A CRL indicates that the review cycle of the application is complete, and the application is not ready for approval. A CRL may require additional inspections, and/or other significant, expensive and time-consuming requirements related to clinical trials, preclinical studies or manufacturing.

2019 Form 10-K at 13–14. Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 of the Complaint, and on that basis deny the same. Defendants further state that Paragraph 70 of the Complaint states legal conclusions as to which no responsive pleading is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 70 of the Complaint.

71.     The manufacturing process for a biological product is usually different from the manufacturing process of drugs. For biologics, "the product is the process," and biologics are often defined by their manufacturing processes. Whereas finished drugs can be replicated with 100 percent confidence in manufacturing sites across the globe, biologics are impossible to recreate with 100 percent accuracy. And while drug manufacturers can change the manufacturing process extensively and analyze the finished product to establish that it is the same as before the manufacturing change, biologic

manufacturers must ensure product consistency, quality and purity by maintaining a substantially similar manufacturing process over time.

Answering Paragraph 71 of the Complaint, Defendants admit that biologic manufacturers must ensure product consistency, quality and purity by maintaining a substantially similar manufacturing process over time. Except as expressly admitted, Defendants deny the allegations in Paragraph 71 of the Complaint.

72. The living systems used to produce biologics can be sensitive to even very minor changes in the manufacturing process. Small changes in the manufacturing process, equipment or facilities can significantly affect the nature of the biological product itself and the way it functions in the body, sometimes requiring additional clinical studies to demonstrate the product's safety, identity, purity and potency. To ensure the manufacturing process remains the same over time, biologic manufacturers must tightly control the source and nature of starting materials, and consistently employ hundreds of process controls that assure predictable manufacturing outcomes. Because a tightly controlled manufacturing process for biologics is crucial, production is monitored by the FDA from the early stages to make sure the final product turns out as expected.

Answering Paragraph 72 of the Complaint, Defendants admit that the living systems used to produce biologics can be sensitive to minor changes in the manufacturing process, and that small changes in the manufacturing process, equipment, or facilities can affect the nature of the biological product and the way it functions in the body. Defendants further admit that, to ensure the manufacturing process remains the same over time, biologic manufacturers must control the source and nature of starting materials, and consistently employ hundreds of process controls that assure predictable manufacturing outcomes. Defendants deny that

production for biologics is "monitored" by the FDA. Except as expressly admitted,

Defendants deny the allegations in Paragraph 71 of the Complaint.

### FDA Form 483

73.     As part of the review process of a BLA, the FDA conducts what is known as a "pre-approval inspection" of the applicant's manufacturing facilities to ensure that the facility complies with applicable rules and regulations in manufacturing the biologic in question. These regulations are known as current Good Manufacturing Practice ("cGMP") regulations and compliance with cGMP includes an investigation of any deviations from cGMP regulations and the correction of those deviations if any are found. Failure to comply with cGMP may result in a variety of consequences, including subjecting a company to regulatory enforcement or a delay in the potential approval and commercialization of a biopharmaceutical product.

Answering Paragraph 73 of the Complaint, Defendants incorporate by

reference their responses to Paragraphs 69 and 70 of the Complaint. Except as

expressly admitted, Defendants deny the allegations in Paragraph 73 of the

Complaint.

74.     Immunomedics emphasized the importance of complying with cGMP in its annual reports on Form 10-K filed with the SEC. For example, the Company informed investors:

**Manufacturing Regulatory Considerations**

In addition to regulating and auditing human clinical trials, the FDA regulates and inspects equipment, facilities and processes used in the manufacturing of such products prior to providing approval to market a product. If, after receiving approval from the FDA, a material change is made in manufacturing equipment, location, or process related to an approved product, additional regulatory review may be required. We must also adhere to cGMP and product-specific regulations enforced by the FDA through its facilities inspection program. The FDA also conducts regular, periodic visits to re-inspect equipment, facilities, and processes following the initial approval. If, as a result of these inspections, the FDA determines that our equipment,

facilities or processes do not comply with applicable FDA regulations and conditions of product approval, the FDA may seek civil, criminal or administrative sanctions and/or remedies against us, including the suspension of our manufacturing operations.

Answering Paragraph 74 of the Complaint, Defendants respectfully refer the Court to Company's Form 10-K for the year ending December 31, 2018, for a complete and accurate description of the content of that document. Except as expressly admitted, Defendants deny the allegations in Paragraph 74 of the Complaint.

75. According to the FDA, a notice on FDA Form 483 may be issued if an inspector finds conditions at a manufacturing facility to be in violation of the Federal Food, Drug and Cosmetic Act, cGMP or any other applicable regulations. A Form 483 logs observations seen during the course of the FDA inspection, and observations are made when an inspector determines that a drug has been adulterated or is being prepared, packed or held under conditions where the drug may be adulterated or become injurious to health due to conditions or practices that are not in compliance with regulations.

Answering Paragraph 75 of the Complaint. Defendants admit that the FDA and other regulatory agencies routinely inspect manufacturing facilities, including in connection with the review of a BLA. Defendants further admit that the FDA generally will issue a notice on Form 483 if it purportedly finds issues with respect to its inspections, to which the facility must adequately respond in order to avoid escalated regulatory concerns. Except as expressly admitted, Defendants deny the allegations in Paragraph 75 of the Complaint.

76. At the end of the inspection, a Form 483 is issued to the company's management if an observed violation has been made by FDA inspectors. In

conjunction with the Form 483, each observation is read and discussed with management at the inspection "close-out" meeting so that the company understands the significance of each observation. Upon receipt of the Form 483 the company must adequately respond within 15 days with a corrective action plan that the company must then implement. The Form 483, the Establishment Inspection Report, any additional evidence/documentation and the company's responses thereto are collectively considered by the FDA in determining whether further action is needed.

Answering Paragraph 76 of the Complaint, Defendants incorporate by reference their response to Paragraph 75 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 76 of the Complaint.

### Establishment Inspection Report — "EIR"

77.     Subsequent to the completion of the FDA's inspection of a company's manufacturing facilities, the FDA inspectors prepare and issue a written Establishment Inspection Report ("EIR"). The EIR includes a detailed summary of the FDA inspection team's findings, details regarding a Form 483 (if issued), descriptions of failures or refusals by the company to remediate observed violations, whether the company is approved for distribution of the product at issue, summaries of interviews conducted by the inspectors, details on the company's training program and a description of the inspectors' tour of the facility. The EIR also includes any objectionable conditions noted by the inspectors, notates supporting evidence for the FDA's conclusions, and details management's responses to the observations during the inspection.

Answering Paragraph 77 of the Complaint, Defendants admit that subsequent to the completion of the FDA's inspection of a company's manufacturing facilities, the FDA prepares a written EIR. Except as expressly admitted, Defendants deny the allegations in Paragraph 77 of the Complaint.

### Complete Response Letter — "CRL"

78.     The final step in the BLA review cycle is the issuance of either an approval letter or a CRL by the FDA. If a company receives a CRL, the FDA's review

of the BLA is complete and the agency has determined that the product is not ready for approval. CRLs may also list additional data, clinical trials, preclinical studies, or remediation of manufacturing issues that may be required of the sponsor company prior to BLA approval. In addition, the FDA may request that the sponsor resubmit the BLA at a future date.

Answering Paragraph 78 of the Complaint, Defendants incorporate by reference their response to Paragraph 70 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 78 of the Complaint.

### The Immunomedics Data Integrity Breach

79.   On January 31, 2018, Immunomedics personnel internally reported a Data Integrity Breach that was discovered upon a review of analysis of bioburden data at the Morris Plains manufacturing facility. "[A]nd in the days immediately following" January 31, 2018, Pehl and the Board of Directors were notified of the Data Integrity Breach. Ex. A, App'x 1, at 2 of 29 (attached hereto). It bears emphasis, moreover, that the Data Integrity Breach was so serious that Immunomedics informed the FDA of the Data Integrity Breach "immediately upon [its] discovery" on January 31, 2018. *Id.* at 4 of 29. Defendants immediately identified the Data Integrity Breach as "a matter deserving [their] utmost attention," and brought in outside counsel to investigate the Data Integrity Breach under the cloak of attorney-client privilege. *Id.* at 2 of 29.

Answering Paragraph 79 of the Complaint, Defendants admit that, in late-January 2018, issues were identified at the Company's Morris Plains, New Jersey, manufacturing plant in a non-routine situation where company personnel came forward describing past misconduct. The issues were first raised on Wednesday, January 31, 2018, and as a result of the Company's robust investigative efforts, the Company notified the FDA by February 5, 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 79 of the Complaint.

80. Immunomedics had originally informed investors that it would be filing the IMMU-132 BLA with the FDA in March 2018. Due to Defendants' discovery of the Data Integrity Breach on January 31, 2018, Defendants knew they needed additional time to begin the process of resolving it. Accordingly, on February 8, 2018 after the market closed, Immunomedics told the investing public that it was pushing its BLA filing date out by two months. In announcing the delay, however, Defendants deliberately concealed from investors any and all information regarding the Data Integrity Breach.

Defendants deny the allegations in Paragraph 80 of the Complaint.

81. To avoid investor outrage with another delay, on May 21, 2018, Immunomedics submitted the BLA to the FDA for IMMU-132. On July 18, 2018, the application was accepted and scheduled to be reviewed by the FDA within six months. Pehl claimed the submission of the BLA for IMMU-132 was a "significant milestone" for the Company and told investors "[w]e will continue to work closely with the [FDA] as we strive to bring this potential new treatment to mTNBC patients expeditiously." But, again, Pehl said nothing about the Data Integrity Breach.

Answering Paragraph 81 of the Complaint, Defendants admit that, on May 21, 2018, the Company announced that it submitted a BLA application to the FDA for IMMU-132. Defendants further admit that, on July 18, 2018, the FDA accepted the application with a targeted action date of January 18, 2019. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 81 of the Complaint.

82. Between August 6 and August 14, 2018, the pre-approval inspection of Immunomedics' manufacturing facilities was conducted in Morris Plains, New Jersey. *See* Exs. B, C (attached hereto). The FDA issued a Form 483 to Pehl and Immunomedics on August 14, 2018, immediately following the completion of the inspection and after consulting with the Company about the agency's findings. Ex. B. The FDA inspectors logged 13 observations on the Form 483, the first two of which related to the Data Integrity Breach. *Id.* The FDA inspectors determined that the Data Integrity Breach should have

triggered a deviation that should have been investigated by the Company's quality control unit, but no deviation was generated. *Id.* at 1. The Form 483 identified that the Data Integrity Breach included "manipulation of bioburden samples, misrepresentation of the [REDACTED] integrity test procedure in the batch record and backdating of batch records, including dates of analytical results." Ex. B at 1. Moreover, the Form 483 stated that the FDA could make no assessment whether the Data Integrity Breach had been remediated because documentation necessary to make that assessment was deliberately withheld by Defendants pursuant to attorney-client privilege. *Id.*

Answering Paragraph 82 of the Complaint, Defendants admit that the FDA conducted a pre-license inspection at the Company's Morris Plains, New Jersey, antibody manufacturing facility from August 6, 2018 through August 14, 2018. Defendants further admit that the FDA issued a Form 483 to Immunomedics on August 14, 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 82 of the Complaint.

83.  On September 4, 2018, Immunomedics issued a 29 page response to the Form 483, but did not make it publicly available. *See* Ex. A. Immunomedics' response conceded that the Data Integrity Breach had first been raised internally on January 31, 2018, and that defendants Pehl, Aghazadeh, Canute, Hutt and Islam had been notified of the Data Integrity Breach immediately following its discovery. *Id.*, App'x 1 at 2 of 29. Immunomedics also confirmed that its internal investigation determined that "employee misconduct [was] identified and verified" and resulted in the "separation of three managers from the Company." *Id.* As a result of the Form 483 observations concerning the Data Integrity Breach, Immunomedics informed the FDA that it had implemented several changes, including the issuance of an Ethical Conduct and Data Integrity corporation policy, initiation of a Data Governance Program and training on data integrity and good documentation practices. *Id.* at 3 of 29.

Answering Paragraph 83 of the Complaint, Defendants admit that Immunomedics responded to the August 14, 2018 Form 483 on September 4, 2018,

and that the response speaks for itself. To the extent that Plaintiffs purport to quote

statements made in Immunomedics's September 4, 2018 Form 483 response,

Defendants deny that such quotations fully or accurately reflect the content of that

response, and respectfully refer the Court to the response itself for a complete and

accurate description of its content. Except as expressly admitted, Defendants deny

the allegations in Paragraph 83 of the Complaint.

84.  Between September 26 and 27, 2018, the FDA inspectors responsible for the
     agency's pre-approval inspection of the Morris Plains manufacturing facility,
     signed the EIR, which contained a detailed narrative of the events that
     occurred during the August 6-14, 2018 pre-approval inspection. *See* Ex. C. At
     bottom, the EIR contained the factual underpinnings of the FDA inspectors'
     observations listed in the August 14, 2018 Form 483 issued to Pehl. The EIR,
     comprised of a 59-page report plus numerous attachments and exhibits,
     confirmed that the Data Integrity Breach had been discovered during the
     review of the bioburden data in January 2018. The EIR also confirmed that
     the status of the Data Integrity Breach could not be ascertained because of
     Immunomedics' repeated invocation of the attorney-client privilege to
     withhold documentary proof to back up Defendants' verbal claims regarding
     the scope and remediation of the Data Integrity Breach. *Id.*, App'x at 41-42.

Answering Paragraph 84 of the Complaint, Defendants admit that, in February

2019, Immunomedics received a written communication from the FDA enclosing

the EIR from the chemistry, manufacturing and controls BLA pre-approval

inspection conducted by the FDA at the Company's Morris Plains, New Jersey,

antibody manufacturing facility for our ADC product candidate sacituzumab

govitecan, which took place from August 6, 2018 through August 14, 2018. To the

extent that Plaintiffs purport to describe or quote statements made in the EIR,

Defendants deny that such quotations fully or accurately reflect the content of that EIR, and respectfully refer the Court to the EIR itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 84 of the Complaint.

85.   With respect to the manipulation of bioburden samples, the EIR noted that "in-process samples were [REDACTED] by the manufacturing operators prior to be submitted to the QC lab for analysis" and the manipulation "was conducted to prevent potential bioburden non-conformances of the samples." *Id.* at 40. The inspectors also determined that an integrity test in the batch record was compromised and "would not have detected any failure in the integrity." Id. The EIR also stated that "operators recorded the operations later using the date when the operation was supposed to be recorded." The inspectors found that the backdating "included information regarding manufacturing operations and input of analytical data." Id.

Answering Paragraph 85 of the Complaint, Defendants incorporate by reference their response to Paragraph 84 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 85 of the Complaint.

86.   The EIR went on to describe the FDA inspectors' interactions with Immunomedics management and their repeated refusal to provide any evidence concerning their verbal claims concerning the scope and purported resolution of the Data Integrity Breach. Specifically, the EIR detailed an inspector's communications with Rosenberg, who was identified as the "most responsible person at the facility at the start of the inspection." *Id.* at 1. An FDA inspector noted in the EIR that he had asked Rosenberg for additional information concerning the Data Integrity Breach, but was only given limited information in response. *Id.* at 40. Rosenberg's initial response was that the Data Integrity Breach had been discovered through an analysis of historical bioburden data in January 2018, and that only two procedures were impacted – manipulation of the bioburden samples and misrepresentation of the integrity test procedures. *Id.* However, the inspector observed that Rosenberg failed to disclose the issue related to the integrity test procedures discovered

by Immunomedics in January 2018 until the inspector directly asked about it. *Id.*

Answering Paragraph 86 of the Complaint, Defendants incorporate by reference their response to Paragraph 84 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 86 of the Complaint.

87. As described in the EIR, on August 9, 2018, the FDA inspector asked Rosenberg again about the Data Integrity Breach, and inquired if it only impacted the two procedures Rosenberg had previously disclosed to him. *Id.* Rosenberg finally conceded that a third procedure had been impacted, which related to the backdating of records. *Id.* Subsequently, the FDA investigator requested information concerning Immunomedics' investigation/deviation of the Data Integrity Breach, and management was forced to admit that no deviation had been initiated. Rosenberg claimed that remediation steps had been taken but refused to honor the FDA's repeated requests for documentation supporting this verbal claim, asserting attorney-client privilege over the documents (which included interview transcripts from the investigation of the Data Integrity Breach performed by outside counsel). *Id.* at 40-41.

Answering Paragraph 87 of the Complaint, Defendants incorporate by reference their response to Paragraph 84 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 87 of the Complaint.

88. The EIR also revealed the FDA inspector's determination that the scope of the Data Integrity Breach was much broader than what had initially been disclosed to the FDA in Immunomedics' early 2018 letter to the agency, which had only identified the manipulation of the bioburden samples. *Id.* at 41. The inspector noted that while Immunomedics had provided an update to the FDA (prior to the August 2018 inspection), the Company had again failed to disclose that any additional procedures had been impacted by the Data Integrity Breach. *Id.*

Answering Paragraph 88 of the Complaint, Defendants incorporate by reference their response to Paragraph 84 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 88 of the Complaint.

89.    On August 9, 2018, Rosenberg gave the FDA inspector a document that he represented was information given to the firm's outside counsel investigating the Data Integrity Breach. *Id.* at 42. But the FDA inspector noted that the document was dated August 7, 2018 and was nothing more than a summary of what Rosenberg had verbally claimed during the inspection. Regardless, the inspector requested to keep a copy of this document for the FDA's records, but Rosenberg refused. *Id.* Accordingly, the EIR logged the FDA inspectors' determination that "no verbal information could be verified during the inspection because the firm refused to provide" documentary proof. *Id.* at 41.

Answering Paragraph 89 of the Complaint, Defendants incorporate by reference their response to Paragraph 84 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 89 of the Complaint.

90.    During the inspection, the FDA inspectors attempted to assess the impact of the Data Integrity Breach through a review of the Company's historical bioburden data. Although Rosenberg insisted throughout the inspection that the Data Integrity Breach had stopped before the process performance qualification ("PPQ") campaign, which was initiated August 1, 2017, the FDA inspector determined after testing the bioburden samples that the Data Integrity Breach "was ongoing during the PPQ campaign and possibly during the commercial campaign." *Id.* at 44 of 66. The FDA inspector found no evidence to support Rosenberg's verbal claim. *Id.*

Answering Paragraph 90 of the Complaint, Defendants incorporate by reference their response to Paragraph 84 of the Complaint. Except as expressly admitted, Defendants deny the allegations in Paragraph 90 of the Complaint.

91.     In response to the FDA inspectors' findings, Immunomedics' management
        "indicated at the [August 14, 2018] inspection close-out that they understood
        the seriousness of the observation[s] and they would respond to the FDA." *Id.*

Answering Paragraph 91 of the Complaint, Defendants incorporate by

reference their response to Paragraph 84 of the Complaint. Except as expressly

admitted, Defendants deny the allegations in Paragraph 91 of the Complaint.

92.     The EIR was provided to Immunomedics and the Individual Defendants on
        February 6, 2019. Within three weeks of its receipt, Pehl was forced to resign.

Answering Paragraph 92 of the Complaint, Defendants admit that in February

2019, Immunomedics received a written communication from the FDA enclosing

the EIR from the chemistry, manufacturing and controls BLA pre-approval

inspection conducted by the FDA at the Company's Morris Plains, New Jersey,

antibody manufacturing facility for our ADC product candidate sacituzumab

govitecan, which took place from August 6, 2018 through August 14, 2018.

Defendants further admit that Mr. Pehl resigned from Immunomedics on February

23, 2019. Except as expressly admitted, Defendants deny the allegations in

Paragraph 92 of the Complaint.

## DEFENDANTS' MISLEADING STATEMENTS
## AND MATERIAL OMISSIONS

93.     After the market closed on February 8, 2018, Immunomedics issued a press
        release and thereafter filed a Form 8-K, signed by Garone and attaching the
        press release, with the SEC. The press release, reviewed and approved for
        publication by Pehl and Garone was entitled "Immunomedics Announces
        Second Quarter Fiscal 2018 Results and Provides Corporate Update." In the
        press release, Pehl stated:

> *I am pleased with the overall progress across clinical and manufacturing work streams, including successful validation runs. Our focus continues to be on compiling a BLA package that efficiently brings [IMMU-132] to market, and one that anticipates and addresses potential FDA requests going forward. As such, we now expect to file the BLA by the end of May 2018.*

Answering Paragraph 93 of the Complaint, Defendants admit that Immunomedics filed a Form 8-K on February 8, 2018, and that the document speaks for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's Form 8-K filed on February 8, 2018, Defendants deny that such quotations fully or accurately reflect the content of that Form 8-K, and respectfully refer the Court to the Form 8-K itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 93 of the Complaint.

94. Immediately after the Company issued its February 8, 2018 press release, Immunomedics held a conference call with analysts and investors to discuss, among other things, the Company's second fiscal quarter of 2018 ("2Q18") financial results, the status of the IMMU-132 BLA and pre-approval inspection efforts at the Morris Plains manufacturing facility. Pehl and Rosenberg participated in the conference call. During Pehl's opening remarks, he stated:

> We continue to work diligently and have made significant progress towards the filing of our BLA. Since joining the company, I have asked for a thorough review of all submission and site inspection related work streams to ensure highest quality of our filing documents and manufacturing and inspection preparedness efforts. *I'm very pleased with the overall status and quality and can confirm that all critical work streams, including, for example, the previously discussed manufacturing validation runs, are yielding positive results.*

> ***We are tracking slightly behind our previously communicated time schedule, as we seek to compile the most complete package possible that anticipates future FDA requests.*** We therefore now anticipate filing the BLA by the end of May 2018.

Answering Paragraph 94 of the Complaint, Defendants admit that Immunomedics held an earnings call on February 8, 2018, and that the recording or transcript of that call speaks for itself. To the extent that Plaintiffs purport to quote statements made during Immunomedics's February 8, 2018 earnings call, Defendants deny that such quotations fully and accurately reflect the content of those statements, and respectfully refer the Court to the recording of that earnings call, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 94 of the Complaint.

95.   Later in the February 8, 2018 conference call, Pehl and Rosenberg engaged in the following exchange with Philip M. Nadeau ("Nadeau"), an equity analyst for Cowen & Co.:

> [NADEAU:] I guess, first question is on the BLA timelines. As you suggested, they're a couple difference versus prior guidance. Could you talk a little bit more about what gave rise to that? Was it simply some of the work streams that you are working on are a little bit – going a little slower than maybe you initially anticipated? Or is it more that in looking through the filing, Michael, you decided that there is some analyses that should be in there to anticipate potential questions from the FDA?

> [PEHL:] Yes, this is Michael. Thanks, Phil, for the question. So let me start by saying that I'm really very pleased with the overall status and the quality of the CMC and clinical submission package. ***And that I can really***

***confirm that all the critical submission-related work streams, including, for example, the previously discussed manufacturing validation runs, are providing positive results.*** There [are] 2 principal reasons for why we are now guiding to a submission date at the end of May, which represents a change of about 2 months. And Morris Rosenberg, who is with me in the room, will provide you with a bit more detail in a minute. The first is that we had a very important pre-BLA CMC meeting with the agency in January, during which they requested that we do 3 additional assays.

***We adjusted our original schedule to allow sufficient time to validate these assays and incorporate the data into our BLA submission package. So that was reason number one. Reason number two is that we had very aggressive initial time lines associated with the validation of the bioanalytical assays and testing for literally thousands of animal and human PK samples.*** And it has just taken us longer than originally anticipated to complete the assay validations, run the samples and incorporate the data into the BLA submission. So we're making really rapid progress and good progress on both of these fronts, and we are very confident that we will meet our new date of end of May. And I just want to hand over to Morris for providing a little bit of detail and flavor.

[ROSENBERG:] Sure. Thank you, Michael. We've made tremendous progress over the last 6 months in process validation, assay validation and so forth. And Michael mentioned that we had the pre-BLA meeting focused on CMC with the FDA. We have an excellent working relationship with the FDA. At that most recent CMC pre-BLA meeting that we had with the agency in January, they requested that we add 3 assays to our package. One assay is a routine assay that measures endotoxin and other pyrogens in an animal model, and the FDA asked us to do this assay on 3 demonstration batches. And we have already performed a very similar assay in vitro that measures the same parameters, measures endotoxin. ***So this is very much***

*sort of a check-the-box exercise. Nonetheless, we have to go through validation and incorporate the data into the BLA.*

Answering Paragraph 95 of the Complaint, Defendants admit that Immunomedics held an earnings call on February 8, 2018, and that the recording or transcript of that call speaks for itself. To the extent that Plaintiffs purport to quote statements made during Immunomedics's February 8, 2018 earnings call, Defendants deny that such quotations fully and accurately reflect the content of those statements, and respectfully refer the Court to the recording of that earnings call, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 95 of the Complaint.

96.    Later in the February 8, 2018 conference call, Rosenberg engaged in the following exchange with James W. Birchenough ("Birchenough"), an equity analyst for Wells Fargo:

> [BIRCHENOUGH:] Congrats, Michael and Morris, on the new roles and the progress. So I wanted to follow up on Phil's questions, just around the manufacturing. You talked about making great progress in these validation assays, but could you comment on the performance? How much visibility you have from FDA in terms of release criteria? And how these assays are performing relative to the release criteria? The impetus of the question is just to understand whether there's any potential risk in these validation assays.
>
> [ROSENBERG:] Yes, thanks for the question. ***So the FDA does have a lot of visibility. So we've had a couple of face-to-face meetings with them and written communications with them. We – they have seen our***

> ***proposed release assays. They have seen our whole manufacturing process, the process flow diagrams and so forth. They have seen our proposed release assays, and it was in that discussion, actually, that they made the suggestion for the 3 additional assays. We discussed it with them and agreed with them that we should put those in place and are doing that.*** And these are, as I was saying before, fairly standard assays. And we have already characterized our process by either very similar assays or exactly these assays. So it's really just an exercise in going through the tailoring to our product and then the validation and then importing the data into the appropriate sections of the BLA.

Answering Paragraph 96 of the Complaint, Defendants admit that Immunomedics held an earnings call on February 8, 2018, and that the recording or transcript of that call speaks for itself. To the extent that Plaintiffs purport to quote statements made during Immunomedics's February 8, 2018 earnings call, Defendants deny that such quotations fully and accurately reflect the content of those statements, and respectfully refer the Court to the recording of that earnings call, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 96 of the Complaint.

97. On February 8, 2018, after Defendants conducted the 2Q18 earnings call, Immunomedics filed its 2Q18 Form 10-Q with the SEC. Defendants Pehl and Garone singed the 2Q18 Form 10-Q. The 2Q18 Form 10-Q contained the following risk disclosure:

> We face a number of risks relating to the maintenance of our information systems and our used of information relating to clinical trials.

In managing our operations, we rely on computer systems and electronic communications, including systems relating to record keeping, financial information, sourcing, and back-up and the internet ("Information Systems"). ***Our Information Systems include the electronic storage of financial, operational, research, patient and other data. Our Information Systems may be subject to interruption or damage from a variety of causes, including power outages, computer and communications failures, system capacity constraints, catastrophic events (such as fires, tornadoes and other natural disasters), cyber risks, computer viruses and security breaches.*** If our Information Systems cease to function properly, are damaged or are subject to unauthorized access, we may suffer interruptions in our operations, be required to make significant investments to fix or replace systems and/or be subject to fines, penalties, lawsuits, or government action. The realization of any of these risks could have a material adverse effect on our business, financial condition and results of operations. Our clinical trials information and patient data (which may include personally identifiable information) is part of our Information Systems and is therefore subject to all of the risks set forth above, notwithstanding our efforts to code and protect such information.

Answering Paragraph 97 of the Complaint, Defendants admit that Immunomedics filed a Form 10-Q on February 8, 2018, and that the document speaks for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's Form 10-Q filed on February 8, 2018, Defendants deny that such quotations fully or accurately reflect the content of that Form 10-Q, and respectfully refer the Court to the Form 10-Q itself for a complete and accurate description of its

content. Except as expressly admitted, Defendants deny the allegations in Paragraph

97 of the Complaint.

98.    On February 22, 2018, the Company participated in the RBC Capital Markets
       Healthcare Conference. During the conference, Pehl engaged in the following
       exchange with Kennan McKay ("McKay"), an RBC Capital Markets equity
       analyst:

> [MACKAY:] And just putting the prior checkpoint
> treatment into context, I think that exemplifies how
> desperate these patients really are. Because this isn't
> exactly an immunologically hot tumor. This is perhaps one
> of the colder tumor types out there where checkpoints
> really don't see activity.
>
> So putting this into context, what are sort of the next steps
> and timelines associated with the regulatory submission?
> What else does need to get done?
>
> [PEHL:] So we communicate[d] in our earnings call that
> the timeline or the time point of our submission is end of
> May. *We had previously communicated a timeline that
> was a couple of [months] earlier, but there is some
> additional work ongoing in terms of assays that the FDA
> has been asking us to do.* And PK work that just needs to
> be finished and finalized in the right quality and that has
> shifted the timeline a little bit.
>
> *The other work stream that is ongoing and where we
> have really made great progress is process validation.* So
> doing validation runs of the antibody, of the linker, of the
> conjugation and of the fill/finish. Most of that work is
> done, so the antibody work is done.
>
> The linker work is almost done and we are now doing the
> last work with our partner BSP in Italy, who does the
> conjugation fill/finish. So we are really going to come in
> very nicely against that timeline.

The third major thing for us is preparing for a preapproval inspection.

That's what the FDA usually does. That's totally not unusual for our Company. Every company with a biologic gets that.

***We hired someone as our head of quality who has eight years of experience as an FDA inspector. She turns basically every stone between New Jersey and New York, I can tell you. And she also brought in a lot of consultants with an FDA background, so we feel that we are extremely well prepared.***

Submission is front and center for us without any doubt. But I think we are doing extremely well against the timelines and the work that needs to be done.

Answering Paragraph 98 of the Complaint, Defendants admit that Immunomedics participated in the RBC Capital Markets Healthcare Conference on February 22, 2018, and that the recording or transcript of that conference speaks for itself. To the extent that Plaintiffs purport to quote statements made during the RBC Capital Markets Healthcare Conference, Defendants deny that such quotations fully and accurately reflect the content of those statements, and respectfully refer the Court to the recording of that conference, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 98 of the Complaint.

99.   On May 9, 2018, Immunomedics held a conference call with analysts and investors to discuss, among other things, the Company's third fiscal quarter of 2018 ("3Q18") financial results and provide a corporate update. Pehl participated in the conference call. During the call, Immunomedics and Pehl published to analysts and investors a PowerPoint presentation entitled

"Corporate Overview, May 2018." The presentation outlined ongoing activities related to the Morris Plains manufacturing facility, as well as IMMU-132 supply in anticipation of commercial launch of the drug. Defendants' PowerPoint presentation informed investors that completing chemistry, manufacturing and controls preparations in advance of the FDA pre-approval inspection of the Morris Plains facility was a *"Key 2018 Business Objective[]," "[p]re-approval inspection activities continue"* and that manufacturing *"[p]rocess [v]alidation"* was ongoing in anticipation of the FDA's pre-approval inspection.

Answering Paragraph 99 of the Complaint, Defendants admit that Immunomedics held an earnings call on May 9, 2018, that a presentation accompanied that call, and that the recording or transcript of that call and the presentation speak for themselves. To the extent that Plaintiffs purport to quote statements made in Immunomedics's May 9, 2018 presentation, Defendants deny that such quotations fully and accurately reflect the content of those statements, and respectfully refer the Court to the presentation itself and the recording of that earnings call, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 99 of the Complaint.

100. On May 9, 2018, Immunomedics filed its 3Q18 Form 10-Q with the SEC. Defendants Pehl and Garone signed the 3Q18 Form 10-Q. The 3Q18 Form 10-Q contained the identical misleading risk disclosure (contained in the 2Q18 Form 10-Q) concerning the Company's information systems. *See* ¶97, *supra.*

Answering Paragraph 100 of the Complaint, Defendants admit that Immunomedics filed a Form 10-Q on May 9, 2018, and that the document speaks

for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's Form 10-Q filed on May 9, 2018, Defendants deny that such quotations fully or accurately reflect the content of that Form 10-Q, and respectfully refer the Court to the Form 10-Q itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 100 of the Complaint.

101. On June 4, 2018, Immunomedics issued a press release containing its presentation the prior day at the ASCO annual meeting in Chicago, Illinois. During the Company's presentation, and with regard to additional manufacturing testing the FDA had requested Immunomedics complete before submitting the BLA, Pehl stated: "***I think we did really, really with the additional time that we gave ourselves due to feedback of FDA who wanted to have some additional assay information and was also very useful for us in order to make sure [the BLA] comes in the highest possible quality.***"

Answering Paragraph 101 of the Complaint, Defendants admit that Immunomedics issued a press release on June 4, 2018, and that the document speaks for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's press release or the presentation made at the ASCO annual meeting, Defendants deny that such quotations fully or accurately reflect the content of those documents, and respectfully refer the Court to the documents themselves and the recording of that meeting, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 101 of the Complaint.

102.   On June 11, 2018, Defendants filed a Form S-3ASR Registration Statement (the "Registration Statement") with the SEC for a follow-on offering of securities, including common stock. Defendants Pehl, Garone, Aghazakeh, Canute, Hutt and Islam signed the Registration Statement pursuant to the Securities Act of 1933. The Registration Statement incorporated by reference the risk disclosure language from the Company's 2017 Form 10-K regarding the Company's information system. That incorporated language is identical to the risk disclosure language contained in the Company's 2Q18 Form 10-Q. *See* ¶97, *supra*. The Registration Statement, however, failed to disclose the Data Integrity Breach discovered by the Company in January 2018.

Answering Paragraph 102 of the Complaint, Defendants admit that

Immunomedics filed a Form S-3ASR Registration Statement on June 11, 2018, and

that the document speaks for itself. Except as expressly admitted, Defendants deny

the allegations in Paragraph 102 of the Complaint.

103.   On June 14, 2018, Defendants filed a Form 424B5 Prospectus ("Prospectus") for the offering of at least 11.5 million shares of common stock at a price of $24.00 per share. The Prospectus contained identical risk disclosure language regarding the Company's information systems as identified in the Company's 2Q18 Form 10-Q. *See* ¶97, *supra*. Like the Registration Statement, the Prospectus failed to disclose the Data Integrity Breach.

Answering Paragraph 103 of the Complaint, Defendants admit that

Immunomedics filed a Form 424B5 Prospectus on June 14, 2018, and that the

document speaks for itself. Except as expressly admitted, Defendants deny the

allegations in Paragraph 103 of the Complaint.

104.   On June 15, 2018, the Company issued a press release entitled "Immunomedics Announces Closing of Public Offering of Common Stock." The Company announced that total net proceeds from the 11.5 million share offering were $260 million (after deducting underwriting discounts and commissions, etc.). Subsequently, the Company disclosed in its 2018 Annual Report on Form 10-K that it had issued an additional 1.725 million shares

pursuant to the underwriters' full exercise of the over-allotment option, bringing the total net proceeds for the June 2018 offering to approximately $300 million. The Company announced that it intended to use the proceeds from the June offering for, among other things, manufacturing process improvements.

Answering Paragraph 104 of the Complaint, Defendants admit that Immunomedics issued a press release titled "Immunomedics Announces Closing of Public Offering of Common Stock" on June 15, 2018, and that the document speaks for itself. Defendants further admit that Immunomedics filed its Form 10-K for the year ending June 30, 2018 on August 23, 2018, and that document also speaks for itself. Except as expressly admitted, Defendants deny the allegations in Paragraph 104 of the Complaint.

105. Defendants' statements, made between February 8, 2018 and June 14, 2018, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading, because Defendants failed to disclose that as discovered on January 31, 2018, Immunomedics suffered a Data Integrity Breach at its Morris Plains manufacturing site for IMMU-132. The scope of the Data Integrity Breach included personnel working for Immunomedics at the Morris Plains facility who had deliberately manipulated bioburden samples of IMMU-132, deliberately backdated batch records, including the dates of analytical results conducted by Immunomedics, and deliberately falsified information in the batch records related to the manufacturing process of IMMU-132. As a result of its severity, the FDA was alerted about the Data Integrity Breach immediately upon its discovery in January 2018.

Defendants deny the allegations in Paragraph 105 of the Complaint.

106. On August 23, 2018, Immunomedics filed its 2018 Form 10-K with the SEC. Defendants Pehl, Garone, Aghazadeh, Canute, Hutt and Islam signed the 2018 Form 10-K. The 2018 Form 10-K contained the identical misleading risk disclosure contained in the Company's prior regulatory filings concerning the

Company's information systems. *See* ¶97, *supra*. The 2018 Form 10-K also contained risk disclosure language concerning the Company's potential receipt of a Form 483 from the FDA (even though Immunomedics had actually received the Form 483 nine-days earlier on August 14, 2018):

> *If we, or any of our collaboration partners, or our or their contract manufacturers, cannot successfully and efficiently manufacture the compounds that make up our products and product candidates, our ability, and the ability of our collaboration partners, to sell products and conduct clinical trials will be impaired.*

> *Our ability to conduct our preclinical and clinical research and development programs depends, in large part, upon our ability to manufacture our proprietary compounds in accordance with the FDA and other regulatory requirements. We have limited historical experience in manufacturing these compounds in significant quantities, and we may not be able to do so in the quantities required to commercialize these products. Any interruption in manufacturing at this site,* whether by natural acts or otherwise, could significantly and adversely affect our operations, and delay our research and development programs.

> We and our collaboration partners also depend on third parties to provide certain raw materials, and contract manufacturing and processing services. All manufacturers of biopharmaceutical products must comply with current [Good Manufacturing Practice regulations or cGMPs], required by the FDA and other regulatory agencies. Such regulations address, among other matters, controls in manufacturing processes, quality control and quality assurance requirements and the maintenance of proper records and documentation. The FDA and other regulatory agencies routinely inspect manufacturing facilities, including in connection with the review of a BLA. *The FDA generally will issue a notice on Form 483 if it finds issues with respect to its inspections, to which the facility must adequately respond in order to avoid escalated regulatory concerns*. *If our manufacturing facility or*

> *those facilities of our collaboration partners and our respective contract manufacturers or processors do not comply with applicable cGMPs and other regulatory requirements, in addition to regulatory enforcement, we may be subject to product liability claims, we may be unable to meet clinical demand for our products, and we could suffer delays in the progress of clinical trials for products under development and of potential approval and commercialization*.

Answering Paragraph 106 of the Complaint, Defendants admit that Immunomedics filed a Form 10-K on August 23, 2018, and that the document speaks for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's Form 10-K filed on August 23, 2018, Defendants deny that such quotations fully or accurately reflect the content of that Form 10-K, and respectfully refer the Court to the Form 10-K itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 106 of the Complaint.

107. On August 24, 2018, the day after Garone signed the Company's 2018 Form 10-K and 10 days after the Company received the FDA's Form 483, Immunomedics announced that Garone had resigned from his position as CFO effective August 23, 2018. The Company further announced that Malik would serve as Immunomedics' interim CFO.

Defendants deny the allegations in Paragraph 107 of the Complaint.

108. On November 7, 2018, Immunomedics held a conference call with analysts and investors to discuss, among other things, the Company's first fiscal quarter of 2019 ("1Q19") financial results and provide a corporate update. Pehl participated in the call. During the call, Pehl stated:

> [The] Company has made significant progress in the first fiscal quarter as we continue to focus on our regulatory,

clinical, manufacturing and launch-preparatory efforts. **_Based on recent mid-cycle discussion with the FDA, the company will continue to work closely and collaboratively with the agency to address outstanding review issues . . . ._**

Answering Paragraph 108 of the Complaint, Defendants admit that Immunomedics held an earnings call on November 7, 2018, and that the recording or transcript of the call speaks for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's November 7, 2018 earnings call, Defendants deny that such quotations fully and accurately reflect the content of those statements, and respectfully refer the Court to the recording of that earnings call, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 108 of the Complaint.

109.   On November 7, 2018, after the earnings call, Immunomedics filed its 1Q19 Form 10-Q with the SEC. Defendants Pehl and Malik signed the 1Q19 Form 10-Q. The Form 10-Q contained the identical misleading risk disclosure (contained in the 2018 Form 10-K) concerning the Company's information systems. *See* ¶97, *supra*. The 1Q19 Form 10-Q also contained the identical misleading risk disclosure (contained in the 2018 Form 10-K) concerning FDA regulation of the manufacturing process and the implications if a Form 483 was received from the FDA. *See* ¶106, *supra*.

Answering Paragraph 109 of the Complaint, Defendants admit that Immunomedics filed a Form 10-Q on November 7, 2018, and that the document speaks for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's Form 10-Q filed on November 7, 2018, Defendants deny that such

quotations fully or accurately reflect the content of that Form 10-Q, and respectfully refer the Court to the Form 10-Q itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 109 of the Complaint.

110. The 1Q19 Form 10-Q also added a new risk factor relating to, among other things, Immunomedics employees who "may engage" in fraudulent conduct or other illegal activity that violates FDA laws, manufacturing standards and the federal securities laws. Specifically, the new risk factor Defendants caused Immunomedics to list in the 1Q19 Form 10-Q stated:

> ***Our employees and our independent contractors, principal investigators, consultants or commercial collaborators, as well as their respective subcontractors, if any, may engage in misconduct or fail to comply with certain regulatory standards and requirements, which could expose us to liability and adversely affect our reputation.***
>
> Our employees and our independent contractors, principal investigators, consultants or commercial collaborators, as well as their respective sub-contractors, if any, may engage in fraudulent conduct or other illegal activity, ***which may include intentional, reckless or negligent conduct that violates, among others, (a) FDA laws and regulations, or those of comparable regulatory authorities in other countries, including those laws that require the reporting of true, complete and accurate information to the FDA, (b) manufacturing standards,*** (c) healthcare fraud and abuse laws or (d) laws that require the true, complete and accurate reporting of financial information or data. For example, such persons may improperly use or misrepresent information obtained in the course of our clinical trials, create fraudulent data in our preclinical studies or clinical trials or misappropriate our drug products, which could result in regulatory sanctions being imposed on us and cause serious harm to our reputation. It is not always

possible for us to identify or deter misconduct by our employees and third parties, and any precautions we may take to detect or prevent such misconduct may not be effective. ***Any misconduct or failure by our employees and our independent contractors, principal investigators, consultants or commercial collaborators, as well as their respective sub-contractors, if any, to comply with the applicable laws or regulations may expose us to governmental investigations, other regulatory action or lawsuits. If any action is instituted against us as a result of the alleged misconduct of our employees or other third parties, regardless of the final outcome, our reputation may be adversely affected and our business may suffer as a result. If we are unsuccessful in defending against any such action, we may also be liable to significant fines or other sanctions, which could have a material and adverse effect on us.***

Defendants, however, failed to inform investors that the Company had already concluded that Immunomedics employees engaged in the precise conduct set forth in the risk disclosure. Specifically, as part of the Data Integrity Breach, Immunomedics employees engaged in the deliberate and fraudulent conduct of falsifying manufacturing processes and documentation relating to the operational status of the Morris Plains manufacturing facility. Defendants, moreover, failed to inform investors that they had made a deliberate decision to withhold disclosure of the details of that fraudulent conduct, as well as the Company's August 14, 2018 receipt of the Form 483 and the content of the Form 483 that explicitly referenced that deceptive conduct.

Answering Paragraph 110 of the Complaint, Defendants admit that Immunomedics filed a Form 10-Q on November 7, 2018, and that the document speaks for itself. To the extent that Plaintiffs purport to quote statements made in Immunomedics's Form 10-Q filed on November 7, 2018, Defendants deny that such quotations fully or accurately reflect the content of that Form 10-Q, and respectfully refer the Court to the Form 10-Q itself for a complete and accurate description of its

75

content. Except as expressly admitted, Defendants deny the allegations in Paragraph

110 of the Complaint.

111.  On November 13, 2018, the Company participated in the Credit Suisse
      Healthcare Conference. During the conference, Malik stated:

> ***Where we are today is we're in a good state to supply the
> market for the next few years based on the current
> [Morris Plains manufacturing] infrastructure that we
> have.*** But we've timed bringing up the second and third
> sourcing of the supply chain in order to have them up and
> running, so that at no point do we have a risk in the supply
> chain or supplying the market. And we've also done
> significant amount of analysis on upside scenarios to
> understand if they are – if there's prescriptions that are
> happening in earlier line or off-label prescriptions or other
> indications come to market or as we expand geographically
> over the next could of year [sic], what are the implications
> on supply. And again based on that modeling, we're
> continuing to scale the supply chain, accordingly.

Answering Paragraph 111 of the Complaint, Defendants admit that

Immunomedics participated in the Credit Suisse Healthcare Conference on

November 13, 2018, and that the recording or transcript of that conference speaks

for itself. To the extent that Plaintiffs purport to quote statements made during the

Credit Suisse Healthcare Conference, Defendants deny that such quotations fully

and accurately reflect the content of those statements, and respectfully refer the

Court to the recording of that conference, or the transcript thereof, for a complete

and accurate description of the statements made. Except as expressly admitted,

Defendants deny the allegations in Paragraph 111 of the Complaint.

112.   As described in further detail below, on December 20, 2018, Dr. Favus issued an equity analyst report disclosing in further detail the contents of the August 14, 2018 Form 483 and the conclusions made by FDA inspectors during the August 6 through August 14, 2018 pre-approval inspection of the Morris Plains manufacturing facility. This revelation, which disclosed only a part of Defendants' fraudulent conduct, also raised fears that the FDA would not approve the IMMU-132 BLA.

Answering Paragraph 112 of the Complaint, Defendants admit that Favus Institutional Research LLC issued an analyst report on Immunomedics on December 20, 2018. To the extent Plaintiffs purport to describe the analyst report, Defendants deny that such descriptions fully or accurately reflect the content of that analyst report, and respectfully refer the Court to the report itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 112 of the Complaint.

113.   As a consequence, Defendants made additional misleading statements through friendly sell-side analysts to assure investors that their concerns were overblown. For example, around 10:00 a.m. on December 20, 2018, Guggenheim analysts reported of their discussions with Immunomedics management:

> According to IMMU management, a competitor research report published this a.m. highlighted IMMU's receipt of an FDA Form-483, citing manufacturing issues regarding sacituzumab, which is currently under FDA review (1/18/2019 PDUFA). ***We spoke with management who pointed out to us that this Form-483 was already received 4 months ago, this August, and the company believes it has addressed manufacturing issues cited in the form.***

Answering Paragraph 113 of the Complaint, Defendants deny that they made any "misleading statements through friendly sell-side analysts to assure investors

that their concerns were overblown." To the extent Plaintiffs purport to quote analyst

reports from December 20, 2018, Defendants respectfully refer the Court to the

reports themselves for complete and accurate descriptions of their content. Except

as expressly admitted, Defendants deny the allegations in Paragraph 113 of the

Complaint.

114.   Approximately one hour later, Morgan Stanley analysts reported on their
       discussions that morning with Immunomedics management:

> We spoke with mgt. who indicated that these issues were
> discovered as part of their ramp to GMP quality in late
> 2017/early 2018 and that mgt. began remediation of the
> issues well prior to the 483. ***Mgt. believes they have
> communicated with the FDA about the issues prior to the
> 483 and have worked to remediate all the key issues. Mgt.
> further indicated that if these issues, including the 483,
> were material they would have issued a release
> highlighting the issues.*** Finally, mgt. indicated that in
> general, the issues can be resolved both as pre or post
> approval commitments and that a follow-up inspection,
> while possible, is not required for approval. Given that
> investors have been worried about manufacturing issues
> potentially impacting the approval of IMMU-132, we
> understand the concern in the market. However, given
> what we see as resolvable issues and the fact that mgt.
> began remediation with FDA prior to the documentation
> in the 483, while these issue may pose approval risk, we
> still believe there is a higher probability of approval than
> not on the PDUFA.

Answering Paragraph 114 of the Complaint, Defendants deny that they made

any "misleading statements through friendly sell-side analysts to assure investors

that their concerns were overblown." To the extent Plaintiffs purport to quote analyst

reports from December 20, 2018, Defendants respectfully refer the Court to the documents themselves for complete and accurate descriptions of their content. Except as expressly admitted, Defendants deny the allegations in Paragraph 114 of the Complaint.

115.    Then, at approximately 11:30 a.m. on December 20, 2018, Wells Fargo analysts reported of their discussions with Immunomedics management:

> ***We have spoken with management this morning regarding observations and understand that they occurred as part of a pre-approval inspection in early August following BLA acceptance and granting of priority review status in July and that the observations are "old news" and a remediation has long been put in place.***
>
> We understand from IMMU management that observations from the FDA pre-approval inspection were "surfaced" by new management 18-19 months ago and have been a focus of remediation efforts even in advance of the FDA inspection. ***While IMMU, appropriately, will not characterize FDA response to remediation efforts so close to a PDUFA date the company suggested that if there are major risks to the filing it would have to disclose more specifics.***

Answering Paragraph 115 of the Complaint, Defendants deny that they made any "misleading statements through friendly sell-side analysts to assure investors that their concerns were overblown." To the extent Plaintiffs purport to quote analyst reports from December 20, 2018, Defendants respectfully refer the Court to the reports themselves for complete and accurate descriptions of their content. Except

as expressly admitted, Defendants deny the allegations in Paragraph 115 of the

Complaint.

116. Shortly before 1:00 p.m. on December 20, Piper Jaffray also issued a report
based on statements from Immunomedics, stating:

> We spoke with IMMU which emphasized that some
> observations were flagged and discussed with the FDA
> well ahead of the inspection and that it continues to
> interact with the FDA on almost a daily basis. At this
> stage, it is "dotting the I's and crossing the T's" and
> IMMU feels that it is in a very good place.

Answering Paragraph 116 of the Complaint, Defendants deny that they made

any "misleading statements through friendly sell-side analysts to assure investors

that their concerns were overblown." To the extent Plaintiffs purport to quote analyst

reports from December 20, 2018, Defendants respectfully refer the Court to the

reports themselves for complete and accurate descriptions of their content. Except

as expressly admitted, Defendants deny the allegations in Paragraph 116 of the

Complaint.

117. Finally, after the market close on December 20, a Jefferies analyst issued a
report based on statements from Immunomedics, stating:

> IMMU traded down 20+% today on negative
> commentary related to an FDA inspection of the
> manufacturing site for the hRS7 antibody component of
> '132.
>
> * * *
>
> **As above, the company confirmed that it received the
> inspection reports in August of this year, and feel that it
> has addressed all of the issues raised during the**

80

> *inspection. While mgmt did not disclose specific content, they were outwardly confident that everything was adequately addressed, and further that they are confident in a positive decision by the FDA on or before the Jan PDUFA date.*

Answering Paragraph 117 of the Complaint, Defendants deny that they made any "misleading statements through friendly sell-side analysts to assure investors that their concerns were overblown." To the extent Plaintiffs purport to quote analyst reports from December 20, 2018, Defendants respectfully refer the Court to the reports themselves for complete and accurate descriptions of their content. Except as expressly admitted, Defendants deny the allegations in Paragraph 117 of the Complaint.

118. On January 10, 2019, the Company participated in the J.P. Morgan Global Healthcare Conference. During the Company's presentation, and in response to an unidentified securities analyst's question concerning the "issues" identified by the FDA in the August 14, 2018 Form 483, Pehl stated: "This is a regulatory question, and I said, in the beginning that I would not comment on a regulatory question." Despite Pehl's insistence that he would not comment on the Form 483, he nonetheless assured analysts and investors: ***"We've got the [Form] 483s in August. We did take care of [the issues] very early."***

Answering Paragraph 118 of the Complaint, Defendants admit that Immunomedics participated in the J.P. Morgan Global Healthcare Conference on January 10, 2019, and that the recording or transcript of that conference speaks for itself. To the extent that Plaintiffs purport to quote statements made during the J.P Morgan Capital Healthcare Conference, Defendants deny that such quotations fully

and accurately reflect the content of those statements, and respectfully refer the Court to the recording of that conference, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 118 of the Complaint.

119. Defendants' statements, made after August 14, 2018 and through January 17, 2019, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading, because Defendants failed to disclose:

      (a)     As discovered on January 31, 2018, Immunomedics suffered a Data Integrity Breach at its Morris Plains manufacturing site for IMMU-132. The scope of the Data Integrity Breach included personnel working for Immunomedics at the Morris Plains facility who had deliberately manipulated bioburden samples of IMMU-132, deliberately backdated batch records, including the dates of analytical results conducted by Immunomedics, and deliberately falsified information in the batch records related to the manufacturing process of IMMU-132. As a result of its severity, the FDA was alerted about the Data Integrity Breach immediately upon its discovery in January 2018;

      (b)     Throughout the Class Period and particularly during the August 6-14, 2018 FDA pre-approval inspection of the Morris Plains manufacturing facility, Immunomedics failed to provide the FDA with written evidence to back up its verbal claims regarding the scope of the Data Integrity Breach, in addition to written information that would confirm Immunomedics' claims that it had purportedly resolved the Data Integrity Breach. Between August 6 and 14, 2018, during the FDA's pre-approval inspection of the Morris Plains facility, FDA inspectors repeatedly asked the Company to produce the results of the outside law firm's investigation into the scope and purported resolution of the Data Integrity Breach, but Defendants refused to provide it

to the FDA on the basis that it was protected by the attorney-client privilege. Accordingly, by the close of the August 14, 2018 pre-approval inspection, the FDA was unable to make an assessment of the scope of the Data Integrity Breach or whether it had ever been resolved;

(c)     On August 14, 2018, the FDA issued a Form 483 to Pehl for the Morris Plains pre-approval inspection. The Form 483 reflected the top-line findings of the FDA inspectors who conducted the pre-approval inspection of the Morris Plains facility. The Form 483 stated that the Data Integrity Breach included the manipulation of bioburden samples, misrepresentation of drug manufacturing integrity testing procedures and backdating of batch records, including the dates of the analytical results; and

(d)     With regard to Defendants' Class Period statements and omissions made after September 4, 2018, those statements were materially misleading when made for the additional reason that Defendants knew that their September 4, 2018 final written response to the Form 483 again failed to provide the FDA with the documentary evidence the agency had repeatedly asked for during the August 8 through 14, 2018 pre-approval inspection, and expressly noted in the Form 483. The FDA had requested this information for the purpose of verifying Immunomedics' verbal assertions concerning the purported scope and remediation of the Data Integrity Breach. By no later than September 4, 2018, therefore, Defendants knew that the FDA would remain unable to make an assessment of Immunomedics' verbal claims concerning the scope and resolution of the Data Integrity Breach. For the same reason, Defendants knew that the FDA would most likely reject the BLA.

Defendants deny the allegations in Paragraph 119 of the Complaint.

## DISCLOSURES OF THE TRUTH

120.  On December 17, 2018, at approximately 3:00 a.m. ET, FDANews published a brief article stating that the Company's Morris Plains manufacturing facility

had been cited by the FDA for a number of violations due to a "February 2018 data integrity breach, which . . . included manipulated bioburden samples, misrepresentation of an integrity test procedure in the batch record, and backdating of batch records, such as dates of analytical results."

Answering Paragraph 120 of the Complaint, Defendants admit that FDAnews posted an article on December 17, 2018 titled "FDA Hits Immunomedics for Data Integrity Breach." Defendants respectfully refer the Court to that article for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 120 of the Complaint.

121.    As result of this news, Immunomedics' share price on the Nasdaq fell 5%, from $18.73 per share at the close of Friday, December 14, 2018, to close at $17.86 on December 17, 2018, with a reported trading volume of 1.49 million shares.

Defendants deny the allegations in Paragraph 121 of the Complaint.

122.    Before the market opening on December 20, 2018, Favus issued an analyst report that disclosed further details of the Form 483, Data Integrity Breach and cGMP violations identified by the FDA during its inspection of the Morris Plains facility. Specifically, Favus revealed that the FDA had issued a Form 483 to Pehl and Immunomedics on August 14, 2018, as a result of the agency's August 6 through August 14, 2018 pre-approval inspection. It was also disclosed that the Form 483 noted "'[i]nterviews [of] Immunomedics personnel involved in the [Data Integrity Breach] were conducted under attorney/client privilege and no additional documentation is available . . . [Thus] no assessment could be made'" of the extent of the Data Integrity Breach.

Answering Paragraph 122 of the Complaint, Defendants admit that Favus Institutional Research LLC issued an analyst report on Immunomedics on December 20, 2018. To the extent Plaintiffs purport to quote or describe the analyst report, Defendants deny that such quotations or descriptions fully or accurately reflect the

content of that analyst report and respectfully refer the Court to the report itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 122 of the Complaint.

123.  As a result of this news, Immunomedics' share price on the Nasdaq fell to a low of $12.96 during the trading day on December 20, 2018, or 27% from the prior day's closing of $17.46. To respond to the Favus Report, and as alleged herein, Pehl and Immunomedics contacted friendly sell-side analysts for purposes of defending the Company's stock price. *See* ¶¶113-118, supra. Within hours, several sell-side analysts published additional false claims made by Immunomedics management such as: The information in the Favus Report was "old news"; "many of the [FDA's] observations were flagged by an internal [Immunomedics] audit ahead of the inspection and discussed with the FDA beforehand. These issues were resolved rapidly after the inspection . . .."; and "remediation has long been put in place." As a result of these misleading statements, Immunomedics' stock price partially recovered during the trading day, and closed at $14.17 per share on December 20, 2018, down $3.47 from the December 19, 2018 close, and down $4.56 from the December 14, 2018 close.

Defendants deny the allegations in Paragraph 123 of the Complaint.

124.  After the market closed on January 17, 2019, Immunomedics announced it had received a CRL from the FDA, which rejected the approval of IMMU-132. Defendants acknowledged that "[t]he issues [in the CRL] were exclusively focused on Chemistry, Manufacturing and Control matters . . . ." Immunomedics further stated that it intended to continue discussions with the FDA regarding the contents of the CRL.

Answering Paragraph 124 of the Complaint, Defendants admit Immunomedics disclosed the receipt of a Complete Response Letter ("CRL") on January 17, 2019. To the extent Plaintiffs purport to quote or describe the Company's January 17, 2019 disclosure, Defendants deny that such quotations or descriptions fully or accurately reflect the content of that disclosure, and respectfully

refer the Court to the disclosure itself for a complete and accurate description of its content. Except as expressly admitted, Defendants deny the allegations in Paragraph 124 of the Complaint.

125. The next morning, on January 18, 2019, and before the market opened, Immunomedics conducted a special conference call to discuss the CRL. During Pehl's opening remarks, he confirmed that the issues identified by the FDA in the CRL "related to the approvability [of IMMU-132]" and "were exclusively focused" on CMC matters. During the conference call, Pehl made the following statements during a discussion with Guggenheim Securities analyst Michael Schmidt ("Schmidt"):

> [SCHMIDT:] Maybe, Michael, first, could you help us and investors to understand this by providing maybe some more details? Maybe, first, could you confirm whether these CMC issues are exclusively related to your facility in Morris Plains?

> [PEHL:] Yes, Michael. Thanks for the question. So to start with, I have to say the CRL was clearly unexpected as we felt we had fully addressed all the open questions during our interactions with the agency.

> And what I want to make very clear is that we continue to believe that all the issues are fully addressable.

> To your question, the questions that we got, as I was just saying, are in relation to questions that we felt we have handled already. They are not clinical. They are not preclinical of nature. They don't required any new data generation, no tox. They are not [study] site related. They are not partner related. So they are obviously questions where we had a lot of interaction already.

> Once again, we feel they are fully addressable. Our next step, of course, is to interact with the agency to fully understand those, this is certainly a very fresh situation for us, and then come up with a very robust plan for the fastest resubmission possible.

Answering Paragraph 125 of the Complaint, Defendants admit that Immunomedics held a special investor call on January 18, 2019, and that the recording or transcript of the call speaks for itself. To the extent that Plaintiffs purport to quote statements made on Immunomedics's January 18, 2019 investor call, Defendants deny that such quotations fully and accurately reflect the content of those statements, and respectfully refer the Court to the recording of that investor call, or the transcript thereof, for a complete and accurate description of the statements made. Except as expressly admitted, Defendants deny the allegations in Paragraph 125 of the Complaint.

126. As a result of the January 17 and January 18 disclosures, Immunomedics' share price on the Nasdaq fell to a close of $13.31 on January 18, 2018, or 26.4% from the prior day's closing of $18.09. This represented a one-day market capitalization loss of approximately $1 billion.

Defendants deny the allegations in Paragraph 126 of the Complaint.

**ADDITIONAL ALLEGATIONS OF SCIENTER**

127. With a long history of operating losses and almost four decades of existence without successfully developing a drug that obtained FDA approval, Immunomedics finally had a chance at achieving success with IMMU-132. Realizing that they could not achieve this alone, Immunomedics entered into a $2 billion licensing agreement for IMMU-132 with Seattle Genetics, wherein Seattle Genetics would be responsible for conducting a Phase 3 clinical trial for IMMU-132, in addition to the manufacturing and commercializing IMMU-132. Seattle Genetics would pay Immunomedics $300 million upfront, with the balance paid upon achieving certain clinical, development, regulatory and sales milestones.

Answering Paragraph 127 of the Complaint, Defendants incorporate by reference their answers to Paragraphs 6 and 27. Except as expressly admitted, Defendants deny the allegations in Paragraph 127 of the Complaint.

128. However, activist shareholder venBio believed Immunomedics was selling IMMU-132 at a steep discount and waged a successful proxy war resulting in the installation of venBio representatives Aghazadeh, Canute, Hutt and Islam on the Company's Board of Directors. At the same time, Rosenberg was hired to get the Morris Plains manufacturing plant ready for the FDA pre-approval inspection, and Pehl was hired as CEO based on his purported track record of successfully seeing drugs through FDA approval at Celgene.

Answering Paragraph 128 of the Complaint, Defendants admit that venBio initiated a proxy battle and received overwhelming support at the 2016 Annual Meeting to assume control and change the mission of the Company. Defendants further admit that Messrs. Aghazadeh, Canute, Hutt, and Islam were elected to Immunomedics's Board of Directors in March 2017; Mr. Pehl became the Company's CEO on December 7, 2017; and Mr. Rosenberg became the Company's CTO on January 8, 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 128 of the Complaint.

129. After the collapse of the $2.0 billion Seattle Genetics deal, Immunomedics was faced with immense financial pressure. To raise funds, Defendants misled the public about the state of Immunomedics' BLA and failed to disclose the Data Integrity Breach. Based on these misrepresentations and material omissions, Defendants artificially inflated Immunomedics' stock price and, in June 2018, launched a follow-on offering of Immunomedics' common stock. Notably, the $300 million obtained from investors was to be used, in part, to correct the Data Integrity Breach and ready the Morris Plains manufacturing facility for the FDA pre-approval inspection. The total net proceeds from the June 2018 offering, including the underwriters' full exercise of the over-

allotment option, was $300 million from the sale of 13.225 million shares of common stock at $24.00 per share.

Defendants deny the allegations in Paragraph 129 of the Complaint.

130. But for Defendants' deliberate decision to withhold information related to the Data Integrity Breach, Immunomedics' Class Period stock price would have been significantly lower, and the Company would not have been able to obtain the $300 million on the same terms and without significant additional dilution to Defendants, venBio and other current shareholders. Without the financing from the June 2018 offering, Immunomedics would not have had the funding to make manufacturing improvements and address the Data Integrity Breach, thereby impeding its ability to obtain FDA approval of its BLA and ultimate commercialization of IMMU-132.

The allegations in Paragraph 130 of the Complaint state legal conclusions to

which no response is required. To the extent that a response is required, Defendants

deny the allegations in Paragraph 130 of the Complaint.

## LOSS CAUSATION/ECONOMIC LOSS

131. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Immunomedics stock and operated as a fraud or deceit on Class Period purchasers of Immunomedics stock by misrepresenting and omitting material information about the Data Integrity Breach. When Defendants' prior misrepresentations and omissions were disclosed to the market, beginning on December 17, 2018, Immunomedics' stock price fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Immunomedics' stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

The allegations in Paragraph 131 of the Complaint state a legal conclusion to

which no response is required. To the extent a response is required, Defendants deny

the allegations in Paragraph 131 of the Complaint.

132.   Defendants' misleading statements and omissions of material facts, identified herein at ¶¶93-103, 106, 108-111, 113-118, had the intended effect and caused Immunomedics' stock to trade at artificially inflated prices during the Class Period. As a direct result of the December 17, 2018, December 20, 2018 and January 18, 2019 disclosures, as detailed in ¶¶120-126, Immunomedics' stock price suffered significant declines.

Defendants deny the allegations in Paragraph 132 of the Complaint.

133.   The disclosure before the market opened on December 17, 2018, as detailed at ¶¶120-121, had a direct impact on the Company's stock price. On December 17, 2018, the price of Immunomedics' stock fell 5%, from $18.73 per share at the close of Friday, December 14, 2018, to close at $17.86 on December 17, 2018, after the market learned that Immonomedics' manufacturing facility had been cited for violations in connection with the Data Integrity Breach.

Defendants deny the allegations in Paragraph 133 of the Complaint.

134.   The disclosure before the market opened on December 20, 2018, as detailed in ¶¶122-123, also had a direct impact on Immunomedics' stock price. On December 20, 2018, the price of Immunomedics' stock dropped $4.86 per share during the first hours of trading on December 20, 2018, and even with Defendants' efforts to prop up the stock price with additional misleading statements, it was down $3.47 per share for the day. This represented a 20% drop in direct response to the additional disclosures regarding the Data Integrity Breach and the FDA's August 2018 pre-approval inspection. In total, Immunomedics stock dropped from a $18.73 per share close on December 14, 2018, to a close of $14.17 per share on December 20, 2018, or 25%, as the market fully absorbed the corrective information regarding the Morris Plains manufacturing facility as disclosed by the FDANews on December 17, 2018 and Favus on December 20, 2018.

Defendants deny the allegations in Paragraph 134 of the Complaint.

135.   The disclosures prior to the market opening on January 18, 2019, when Immunomedics announced that it had received a CRL from the FDA, as detailed above in ¶¶124–126, also had a direct impact on the Company's stock price. The price of Immunomedics' stock fell 26.4% on January 18, 2019, from a closing price of $18.09 on January 17, 2019 to a close of $13.31 on

January 18, 2019, as a direct result of receipt of the CRL and Defendants' explanations as to why the CRL had been issued by the FDA.

Defendants deny the allegations in Paragraph 135 of the Complaint.

136. The declines in Immunomedics' stock price on December 17, 2018, December 20, 2018 and January 18, 2019 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market.

Defendants deny the allegations in Paragraph 136 of the Complaint.

137. The timing and magnitude of Immunomedics' stock price decline negates any inference that the losses suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct. On December 17, 2018, Nasdaq was down only 2.3%, with the Nasdaq U.S. Smart Pharmaceuticals Index down 2.0%. On December 20, 2018, the Nasdaq declined 1.6% and the Nasdaq Smart Pharma declined 1.9%. And on January 18, 2019, when Immunomedics' stock fell by 26.4%, the Nasdaq and Nasdaq Smart Pharmaceuticals Index increased 1.0% and 0.6%, respectively.

The allegations in Paragraph 137 of the Complaint state a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 137 of the Complaint.

138. The economic losses suffered by Lead Plaintiffs and other members of the Class were a direct result of Defendants' fraudulent scheme to inflate Immunomedics' stock price and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

The allegations in Paragraph 138 of the Complaint state a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 138 of the Complaint.

# COUNT I

## For Violations of Section 10(b) of the Exchange Act and
## Rule 10b-5 Against All Defendants

139.  Plaintiffs incorporate ¶¶1-138 by reference.

No response from Defendants is required to Paragraph 139 of the Complaint.
To the extent a response is required, Defendants repeat and reallege each and every
response set forth in the foregoing Paragraphs as if fully set forth herein and, unless
expressly admitted, deny the allegations in Paragraph 139 of the Complaint.

140.  During the Class Period, Defendants disseminated or approved the false
statements specified above, which they knew or deliberately disregarded were
misleading in that they contained misrepresentations and concealed material
facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading.

Defendants deny the allegations in Paragraph 140 of the Complaint.

141.  Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes, and artifices to
defraud;

(b)      Made untrue statements of material facts or
omitted to state material facts necessary in order to make
the statements made, in light of the circumstances under
which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of
business that operated as a fraud or deceit upon Plaintiffs
and others similarly situated in connection with their
purchases of Immunomedics securities during the Class
Period.

Paragraph 141 of the Complaint states a legal conclusion to which no response from Defendants is required. To the extent a response is required, Defendants deny the allegations in Paragraph 141 of the Complaint.

142. In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to Immunomedics' operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.).

Paragraph 142 of the Complaint states a legal conclusion to which no response from Defendants is required. To the extent a response is required, Defendants deny the allegations in Paragraph 142 of the Complaint.

143. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases of Immunomedics common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Immunomedics securities and experienced losses when the artificial inflation was released from Immunomedics securities as a result of the revelations and prices decline detailed herein. Plaintiffs and the Class would not have purchased Immunomedics securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

Defendants deny the allegations in Paragraph 143 of the Complaint.

144. By virtue of the foregoing, Immunomedics and the Exchange Act Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

Paragraph 144 of the Complaint states a legal conclusion to which no response from Defendants is required. To the extent a response is required, Defendants deny the allegations in Paragraph 144 of the Complaint.

## COUNT II

### For Violations of Section 20(a) of the
### Exchange Act Against All Defendants

145.   Plaintiffs incorporate ¶¶1-144 by reference.

No response from Defendants is required to Paragraph 145 of the Complaint. To the extent a response is required, Defendants repeat and reallege each and every response set forth in the foregoing Paragraphs as if fully set forth herein and, unless expressly admitted, deny the allegations in Paragraph 145 of the Complaint.

146.   The Individual Defendants acted as controlling persons of Immunomedics within the meaning of §20(a) of the Exchange Act. Immunomedics controlled all of its employees and the Individual Defendants. By virtue of their high-level positions, and their ownership and contractual rights, and awareness of the operational status of the Morris Plains manufacturing facility, as well as their intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants participated in the conference calls with investors and analysts, described herein at ¶¶94-96, 98-99, 108, 111, 113-118, and/or prepared and approved the Company's SEC filings and press releases, described herein at ¶¶93, 97, 100-103, 106, 109-110, alleged by Plaintiffs to be misleading.

Paragraph 146 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 146 of the Complaint.

147.   In particular, Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. By reason of such conduct, Defendants are liable pursuant to §20(a).

Defendants deny the allegations in Paragraph 147 of the Complaint.

148.   As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Immunomedics common stock during the Class Period.

Paragraph 148 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 148 of the Complaint.

## PRAYER FOR RELIEF

Answering Plaintiffs' unnumbered "Prayer for Relief" Paragraph, Defendants deny the allegations in that Paragraph and deny that Plaintiffs are entitled to recover any damages on their claims in this action. Defendants request that the Court dismiss Plaintiffs' claims with prejudice and enter judgment in favor of Defendants on all the claims in this action.

## JURY DEMAND

No response from Defendants is required to Plaintiffs' unnumbered "Jury Demand" Paragraph.

## DEFENSES

Defendants assert the following defenses and affirmative defenses without assuming the burden of proof as to any issue or element that otherwise rests with Plaintiffs. This statement of defenses and affirmative defenses is based on Defendants' investigation to date, and Defendants reserve the right to supplement and amend these defenses or affirmative defenses during the course of the litigation.

**First Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because the Complaint fails to state a claim upon which relief can be granted.

**Second Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because Plaintiffs cannot plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1), and otherwise have failed to properly identify the alleged false or misleading statements of which Plaintiffs complain or to explain why those statements were false or misleading.

**Third Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, and the putative class

is not entitled to any recovery from Defendants under the Exchange Act, because Defendants did not make any untrue statement of material fact, nor did they omit to state any material fact required to be stated or necessary to make the statements made not misleading.

**Fourth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because Defendants' alleged misstatements were not material to the investment decisions of a reasonable investor in view of, *inter alia*, the total mix of available information.

**Fifth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because Defendants' alleged misstatements are non-actionable statements containing expressions of opinion, repetition of publicly available information, and forward-looking statements, and/or contained sufficient cautionary language and risk disclosures.

**Sixth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because Defendants acted at all times in good faith and without knowledge or intent to commit securities fraud and did not directly or indirectly participate in, or induce, any unlawful acts.

**Seventh Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred because Defendants did not knowingly or with deliberate recklessness make any untrue statement of material fact, nor did Defendants knowingly or with deliberate recklessness omit to state a material fact required to be stated or necessary to make their statements not misleading. Defendants did not knowingly or with deliberate recklessness disregard the truthfulness and accuracy of each of the statements alleged in the Complaint to be inaccurate or fraudulent.

**Eighth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because Defendants did not know, and in the exercise of reasonable care could not have known, that any of the challenged statements contained an untrue statement of material fact or an omission of a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

**Ninth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, for lack of actual and/or justifiable reliance on Defendants' alleged misstatements or on any disclosures

allegedly rendered materially false or misleading as a result of any alleged omission by Defendants.

**Tenth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because Plaintiffs relied exclusively upon their own reasonable independent investigations, their own decisions, and the advice of their professional investment advisors.

**Eleventh Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because any increase or decrease in the market value of Immunomedics's stock held by Plaintiffs and/or any putative class members was the result of market or other economic factors separate from the alleged wrongful conduct by Defendants.

**Twelfth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because the damages suffered by Plaintiffs and/or by members of the putative class, if any, were not caused by the alleged conduct of Defendants.

**Thirteenth Defense**

Defendants' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because Plaintiffs

and/or any putative class members have failed to mitigate damages and have failed to exercise due diligence in an effort to mitigate their damages (to which, in any event, they are not entitled).

**Fourteenth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because the damages suffered by Plaintiffs and/or by putative class members, if any, were caused by independent, intervening, and/or superseding events beyond Defendants' control and unrelated to Defendants' conduct, and/or by the policies, practices, acts, or omissions of independent persons or entities other than Defendants over which Defendants have no control.

**Fifteenth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class Plaintiffs purport to represent are barred, in whole or in part, because the damages sought are too speculative and remote.

**Sixteenth Defense**

Plaintiffs' claims and/or the claims of any members of the putative class Plaintiffs purport to represent are barred, in whole or in part, because Plaintiffs have not suffered cognizable damages.

**Seventeenth Defense**

The Individual Defendants are not liable under Section 20(a) of the Exchange Act for control person liability because they acted in good faith, without knowledge or deliberate recklessness in relation to the purported wrongdoing, and did not directly or indirectly induce the alleged violations of Section 10(b) and Rule 10b-5.

**Eighteenth Defense**

The Individual Defendants are not liable under Section 20(a) of the Exchange Act because they did not directly or indirectly control another person who is liable for damages under the Act.

**Nineteenth Defense**

The Individual Defendants are not liable under Section 20(a) of the Exchange Act because there was no underlying violation of Section 10(b) and Rule 10b-5 by a controlled person.

**Twentieth Defense**

Defendants are absolved from any and all liability for the wrongs alleged in the Complaint by reason of their full compliance with all statutes, regulations, or other laws in effect at the time of the conduct alleged in the Complaint.

**Twenty-First Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, because of inequitable conduct and unclean hands.

**Twenty-Second Defense**

Plaintiffs' claims and/or the claims of any members of the putative class that Plaintiffs purport to represent are barred, in whole or in part, by laches, equitable estoppel, waiver, or other related equitable doctrines.

**Twenty-Third Defense**

To the extent that Plaintiffs were not purchasers of Immunomedics's stock during the Class Period, Plaintiffs' claims are barred for lack of standing to assert claims against Defendants for violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule l0b-5 thereunder, 17 C.F.R. § 240.10b-5, or Section 20(a), 15 U.S.C. § 78t(a), of the Securities and Exchange Act of 1934.

**Twenty-Fourth Defense**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs do not meet the requirements of Rule 23.

**Twenty-Fifth Defense**

Plaintiffs' claims cannot properly be maintained in a class action because Plaintiffs are not proper class representatives and would not fairly and adequately protect the interests of the members of the putative class.

**Twenty-Sixth Defense**

Plaintiffs' claims are barred, in whole or in part, because the putative class period for Plaintiffs' claims are overbroad and, therefore, many of the putative class members are not entitled to any recovery.

**Twenty-Seventh Defense**

Defendants are entitled to recover contribution from others for any liability they incur as a result of any of the alleged misrepresentations, omissions, and conduct attributable to such third parties.

**Twenty-Eighth Defense**

Defendants are entitled to offset the damages of Plaintiffs, if any, by benefits received by Plaintiffs through their investment in Immunomedics, in accordance with the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule, or regulation.

**Twenty-Ninth Defense**

Answers to each Paragraph of the Complaint are made by Defendants without waiving, but expressly reserving, all rights they may have to seek relief by appropriate motions directed to the allegations in the Complaint.

WHEREFORE, Defendants respectfully request that the Court dismiss this action with prejudice, enter judgment against Plaintiffs in Defendants' favor as to all issues and matters set forth in the Complaint, award costs, disbursements, and

attorneys' fees to Defendants, and grant such other and further relief as the Court

deems just and proper.

Dated: September 11, 2020

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Marshall R. King*

Brian M. Lutz (*pro hac vice*)
555 Mission Street, Suite 3000
San Francisco, CA 94015
Phone: (415) 393-8379
Fax: (415) 374-8474
Email: BLutz@gibsondunn.com

Allison K. Kostecka (*pro hac vice*
*forthcoming*)
1801 California Street, Suite 4200
Denver, CO 80202
Phone: (303) 298-5718
Fax: (303) 313-2834
Email: AKostecka@gibsondunn.com

Marshall R. King
Laura K. O'Boyle (*pro hac vice*)
Kory Hines (*pro hac vice*)
200 Park Avenue
New York, NY 10166
Phone: (212) 351-2304
Fax: (212) 351-5243
Email: MKing@gibsondunn.com
Email: LOBoyle@gibsondunn.com
Email: KHines@gibsondunn.com

*Counsel for Defendants*